**In re Mikie Raye BUSH, Debtor.**

**Frederick and Emily Buckway, Debtors.**

Nos. 01–02958, 01–3151.

United States Bankruptcy Court, D. Idaho.

March 15, 2002.

Gary L. McClendon, Staff Attorney, Boise, Idaho, for the Office of the U.S. Trustee.

Richard Crawforth, Boise, Idaho, trustee.

## MEMORANDUM OF DECISION

TERRY MYERS, Bankruptcy Judge.

## I. INTRODUCTION

Mikie Bush represented herself in her chapter 7 case. When Wells Fargo Bank served her with a motion for stay relief on her 2000 Plymouth Neon, she came to court. During the hearing, the Court asked her how she came to believe, as shown on her schedule C, that the car was "exempt" and how she reached the decision to "reaffirm" the Wells Fargo debt as she indicated on her § 521 statement of intention. She replied that Leo Wees, her bankruptcy petition preparer, told her how to complete those forms "because I've never gone to court" and "I didn't know what I was doing." [1] Her further discussion with the Court indicated that she had no idea what an exemption was, much less what exemptions were properly available in Idaho, and that Mr. Wees had provided the statutory authority she put on her schedule C. She had a similar lack of understanding about her options for dealing with secured consumer debt. In all these regards, she obtained advice and assistance from Mr. Wees. Only in this way did she complete her bankruptcy paperwork.

Frederick and Emily Buckway are also *pro se* chapter 7 debtors. During their case, they were notified of a hearing that was going to be held to consider the motion of Wells Fargo Bank for stay relief

regarding their 1997 Pontiac Sunfire. At that hearing, a discussion occurred which was similar in nature and thrust to that occurring in Ms. Bush's case. These debtors also indicated their lack of understanding of the exemption they claimed and related issues, and advised that Mr. Wees also guided them through these issues in order that they could complete their bankruptcy schedules and statements.

As a result of these hearings, the Court issued Orders to Show Cause directed to Mr. Wees. *See* Doc. No. 10 (Buckway); Doc. No. 16 (Bush).[2] A hearing was scheduled for December 13, 2001 in order that Mr. Wees could explain exactly what did and did not occur in his role as a bankruptcy petition preparer ("BPP") for these Debtors. Mr. Wees was advised that, in addition to addressing whether he met the requirements and honored the limitations of § 110, the Court would also consider the reasonableness of the $150 fee he charged for his services.

The hearing was held, and Mr. Wees testified at length. He and the U.S. Trustee were allowed, at their request, an extended period for supplementation of the record and for briefing. The matter was fully submitted on February 13, 2002.

The Court concludes that Mr. Wees violated § 110 in several regards, that Mr. Wees engaged in the unauthorized practice of law, and that Mr. Wees' charges for his BPP services were excessive. Appropriate remedies and consequences are imposed. This decision constitutes the Court's findings of fact and conclusions of law on all contested matters. Fed.R.Bankr.P. 9014, 7052.

---

1. Transcript of November 21, 2001 hearing (Doc. No. 17) at p. 6.

2. These Orders contain further specifics as to the facts and circumstances which have been, in this Introduction, only more generally stated.

## II. FACTS[3]

Mr. Wees has a high school education, attended college for 4 years and obtained an associates degree. He has been acting as a BPP for many years, and gained familiarity with bankruptcy paperwork when he ran a photocopy service as a contractor with the Clerk of this Court.

Mr. Wees is the owner and operator of "Self–Help Legal Alternatives," which is the trade name of Self–Help Legal Alternatives of Idaho, Inc., an Idaho corporation. He is the sole employee of that corporation. His business involves preparing and selling pleadings and paperwork for civil legal matters, and is designed to provide individuals with a less expensive alternative to lawyers. While divorces, guardianships, support and custody matters, and wills are part of his product mix, bankruptcies are the major component. Mr. Wees estimated that 33% of his business income is generated through his work as a BPP. He testified that he files 12 to 15 cases a month (144 to 180 per year) at a fee of $150 per case. This would account for $21,600 to $27,000 a year, which is actually closer to 50% of the gross annual income of $50,000 which he claimed to generate.

Mr. Wees has no legal training, and is essentially self-taught in regard to the law. He is also a member of a group known as the "National Association of Independent Paralegals." Mr. Wees pays a fee to belong to this group and attend its seminars. Doing so entitles him to a "certificate" which he has framed and displayed on the wall at his business. According to Mr. Wees, this entity conducts no testing or evaluation before "certifying" an individual.

Mr. Wees meets personally with his potential bankruptcy customers. When such a customer walks into Mr. Wees' business in Boise, he or she passes time in a waiting room. Reading materials include layman's guides to legal issues and similar materials, particularly those from Nolo Press, an entity which publishes some of the resources regularly used by Mr. Wees and which appears, according to his testimony, to have ties to the NAIP.

Mr. Wees indicates that there are numerous signs in his waiting room, many of which allegedly reinforce the message that he is not a lawyer and doesn't provide legal advice. One sign, $3' \times 5'$ in size, announces:

SELF–HELP LEGAL FORMS

Forms, Books and Typing

We are not attorneys.

We do not offer legal advice.

At the same time, customers can peruse various materials of a legal nature, see the name "Self–Help Legal Alternatives" displayed, and admire the framed document indicating Mr. Wees' status as a "certified independent paralegal."

A preprinted disclosure or acknowledgment appears on the first page of Mr. Wees' bankruptcy "worksheet" which he has the customer sign. It states:

The undersigned customer hereby acknowledges that he/she clearly understands that no employee of Self–Help

---

3. The facts are taken almost entirely from the testimony of Mr. Wees during the December hearing and from his post-hearing affirmations. While neither Ms. Bush nor the Buckways appeared at the December 13 hearing, their comments at the earlier stay lift hearings are consistent with what Mr. Wees related. There are also some additional facts, concerning the issue of the reasonable amount of BPP compensation, which are derived from the parties' post-hearing affidavits and submissions. Neither Mr. Wees nor the U.S. Trustee expressed desire to cross-examine the other's post-hearing affiants or to examine the Debtors.

Legal Alternatives is an attorney; that he/she has not sought nor received legal advice; that he/she made all decisions required to prepare the forms relating to this worksheet; that he/she will review all forms prepared from said information; and, that he/she will be totally responsible for all required court filing, appearances and results or consequences.

*See* Exhibit 4, p. 1.

Mr. Wees asks his bankruptcy customers to bring with them to their meeting documents concerning their finances and recent bills. He extracts debt amounts, creditor addresses, and account numbers from that material, and enters that information into his computer. This data will ultimately be set out on the debtor's schedules of creditors (schedules D, E and F).[4]

The customer is also given a worksheet-type form at the meeting. *See* Exhibits 1. This worksheet was developed by Mr. Wees. He uses the worksheet, in conjunction with some of the actual schedules and the statement of financial affairs, in analyzing and clarifying the customer's situation. He will go over the schedules and statements line by line, and solicit the customer's answers and information. He believes this lessens the "intimidation" which he believes many people feel when they look at the official bankruptcy forms and contemplate filling it out themselves.

In regard to a customer's property, the "instructions" on the worksheet state:

*BANKRUPTCY SCHEDULES "A" (REAL PROPERTY), "B" (PERSONAL PROPERTY) and SCHEDULE "C" (EXEMPT PROPERTY)*

The court requires every debtor to list any property owned (whether or not it is paid for or if payments are still being made) on the appropriate "Schedule."

Assuming that any person filing for bankruptcy desires to retain as much of their property as possible, the attached sheets begin by listing the current exemptions, as allowed under Idaho law. If you own any property described by these various exemption rules, then list such property in the appropriate boxes, with a description, the quantity of each, and an estimate of value. At the end of these sheets, there is additional room to list any other property that you own that you have not previously listed.

All of the items listed on the attached sheets will be transferred to Schedule A if it is real property; Schedule B if it is personal property; and also onto Schedule C, if you have listed it under an exempt category.

*See* Exhibit 1, at p. 1. The worksheet then continues to set out, over the course of 5 pages, numerous categories of property. Each category is identified first by reference to a provision of the Idaho Code[5] and then is divided into subcategories with descriptions of the type of property potentially exempt. Each of the descriptions follows, according to Mr. Wees, the language of the subparts of the cited Idaho Code provisions.[6] A place is provided for the customer to indicate the quantity and

---

4. Mr. Wees does all the manual work in his business; he does not employ typists. Thus he personally inputs the information into the computer database and, ultimately, the final forms. He also programmed the software (a combination of DOS and Wordperfect) which he uses to prepare the bankruptcy paperwork.

5. Customers don't chose whether to claim federal or state exemption. Mr. Wees has

preset his software to show on schedule C that state exemptions are elected. He did so based on Idaho's opt-out of the federal exemptions. *See* § 522(b)(1); Idaho Code § 11–609.

6. He relies, in large part, on Nolo Press publications for purposes of providing what he feels to be a complete, accurate and up-to-date list.

value of the items fitting the provided descriptions. In certain aspects, entire provisions of the Idaho Code are quoted at length. A place is provided at the end for the customer to:

> List any other property that you (or your spouse) own that was not listed under any of the preceding exempt categories.

*Id.*, at p. 7.

The customers will then proceed to fill these out, line by line, as they meet with Mr. Wees, and they do so with his help, guidance and assistance. Mr. Wees explained the nature of his assistance in one of his written submissions:

> Respondent [*i.e.*, Mr. Wees] utilizes two methods of assisting the debtor in the determining what property they may legitimately claim as exempt. First, respondent has prepared a worksheet for the debtor, listing all of the common exemptions available to debtors under Idaho Code, Titles 11 and 55. In such worksheet, the current exemptions are listed, word-for-word, with a place after each sub-part to list any property that debtor(s) own, described in such exemption. In the event the debtor owns property not fitting within the exemptions mentioned above, respondent refers the debtor(s) to the "Idaho" section of the state-by-state listing of exemptions, contained in the book entitled How To File Chapter 7 Bankruptcy by Nolo Press. Although the worksheet mentioned hereinabove does not list exemptions under other various sections Idaho Code, the How To File Chapter 7 Bankruptcy book by Nolo Press does mentioned exemptions under such chapter. If after a debtor has any other

property not listed under one of the exemptions under Title 11 or Title 55, Idaho Code, we would log onto the State of Idaho website and print a current copy of the appropriate title to see if it applied to such otherwise non-exempt property.

Respondent's Brief re: Order to Show Cause, Doc. No. 28 (Bush), at p. 6–7. Exhibits 2 and 3 are representative of some of the printed materials discussing legal issues which Mr. Wees provides his customers or refers them to during these meetings.

His assistance will also sometimes include correcting errors made by his customers, suggesting to them that they should recheck and consider changing something they've stated, or helping them toward an answer.[7] He will on occasion look up car values on the NADA website in order to assist customers in valuing such assets.

When this joint drafting session has been concluded, Mr. Wees will cause a final version of the bankruptcy paperwork to be prepared. This is generated from the data he has himself prepared from his customers' bills and records, as well as from the worksheet and forms used at the meeting, and the customer's oral responses to questioning. Mr. Wees estimated that 5 to 6 hours of time is required, in total, for preparation of a typical case, and that both Ms. Bush's case and that of the Buckways fit the norm.

As noted, Mr. Wees has no staff, and he performs all the word processing involved, as well as photocopying and document assembly. His January 3 affidavit, Doc. No. 25 (Bush), Doc. No. 21 (Buckway), provides a breakdown of his typical case:

---

7. Mr. Wees at one point states: "Respondent uses the actual bankruptcy documents (not an interview sheet) and reads each question to the debtors and records their response. If debtors do not understand a question, respon-dent refers them to the relevant section or definition provided in a self-help book entitled 'How To File For Chapter 7 Bankruptcy' published by Nolo Press." *See* Doc. No. 28, at p. 5. *See also* Exhibit 3.

(2.0 hours) Collecting information, providing literature to explain technical terms (reaffirmation/redemption/lien avoidance/selection of exemptions) and manually filling out each documents.

(2.5 hours) Typing all forms.

(1.5 hours) Reviewing completed documents with customer for clerical errors, making corrections if needed, and affixing of both customer and preparer signatures, making and collating three (3) more sets of copies.

*Id.* at p. 3–4.

Mr. Wees will provide customers the option of filing their bankruptcy petition and papers themselves, or having him take them to the court as a "courier." The customer is responsible for paying the filing fee. When Mr. Wees delivers the pleadings, he will deliver the debtor's funds as well. Mr. Wees testified that, at times, he has received a single check from a customer, covering both the court filing fee and the $150.00 fee for his services, and has used a Self–Help business check for the filing fee.[8]

If amendments are necessary, he will prepare them without charge, but requires the customer to pay the attendant court fee. He will at times file the amendments and deliver the fee for his customers.

He also explains certain post-filing aspects of the bankruptcy process to his customers. This includes advising them as part of the initial interview process about the standard "tax turnover order" issued by the Court in chapter 7 cases, and responding to questions they might raise post-filing about that order. He will also at times advise them of the consequences of failing to appear for their § 341 meeting and examination.

Mr. Wees claims to have high customer satisfaction, and states that most of his business comes by way of referral.[9] He has advertised in the past using the Self–Help Legal Forms name, but contends he has canceled or is allowing his yellow page advertising to lapse.[10] He also testified that he expects to move into the Internet arena (under the name "courtready.com") in furtherance of his business of assisting *pro se* litigants, including bankruptcy debtors.

## III. DISCUSSION AND DISPOSITION

### A. *In re Farness*

We are not writing on a blank slate. Mr. Wees' conduct as a BPP was ad-

---

8. In addition to obvious concerns over his practice, given the express prohibitions of § 110(g)(1), the Court concludes that Mr. Wees has also at times transgressed Fed. R.Bankr.P. 1006(b)(3). That is, he has accepted a BPP fee while the customer is seeking to pay the court filing fee in instalments. In fact, this appeared to have occurred in Ms. Bush's chapter 7. However, the Court accepts Mr. Wees' explanation regarding the timing of the transactions in that case and the errors which were contained in the pleadings. Mr. Wees insists that he is now sensitive to the prohibition, and consequences for violation, of Rule 1006(b)(3).

9. The Court doesn't really doubt this representation. Mr. Wees is a pleasant individual. He spends a relatively significant amount of

time with his customers in order to approach the preparation of paperwork in the fashion described above. He appears to be thorough and attentive to detail, and his work product shows it. The comments of the Trustee indicate that a "Wees bankruptcy" is often easy to evaluate because of the detail and completeness of the forms. Of course, the quality of that work is not the question, rather, it is whether Mr. Wees is entitled to perform such work at all.

10. In Mr. Wees' reply brief, he also indicated that he amended the corporate name from "Self–Help Legal Alternatives of Idaho, Inc." to "Self–Help, Inc." This occurred post-hearing on February 1, 2002. *See* Doc. No. 35 (Bush), at p. 2 and at Exhibit A.

dressed at length in *In re Farness*, 244 B.R. 464, 00.1 I.B.C.R. 26 (Bankr.D.Idaho 2000). Mr. Wees is well aware of what the Court said and ruled in *Farness*, and it is readily available for review by others. It is therefore not necessary to repeat that analysis at length in today's decision. However, certain conclusions of the Court merit brief review.

■ The Court described the policy underlying the promulgation of § 110 and noted:

> The key to § 110 is that a petition preparer may provide typing services, but may not in the guise thereof advise debtors of their rights and options or otherwise engage in the practice of law. This Court in *Mitchell* [*In re Mitchell*, 97.1 I.B.C.R. 5, 6 (Bankr.D.Idaho 1997)] recognized the distinction:
>
>> Document preparers are not attorneys ... The task to organize information and type it is something a trained legal secretary can do, no more and no less. A document preparer may not give legal advice ... Consequently, a document preparer should be compensated in the same fashion, and in the same amount as a legal secretary.

244 B.R. at 467.

The Court also held in *Farness* that Wees' use of the phrases "self-help legal alternatives" and "legal form preparation" violated § 110(f)(1).[11] The Court rejected his argument that the word "legal" is sufficiently modified by the word "alternatives" so that § 110(f)(1) is not offended and that no reasonable person would be misled into thinking that Wees' business offered legal advice. 244 B.R. at 468–69. The Court stated:

> [T]he purpose of the statute, as well as its literal command, is here violated. As in the cases cited above, Wees' advertisement creates the misleading impression that his business offers more than mere typing services to its clients. The word "legal" is not defined away by the word "alternatives." Rather, the phrase "legal alternatives" implies that a debtor can hire Wees *in lieu of* an attorney to prepare a bankruptcy filing.

*Id.* (emphasis supplied).

The Court further concluded that Mr. Wees engaged in the unauthorized practice of law, within the sense of the use of that term under § 110(k) and under Idaho law. 244 B.R. at 470–72. The Court stated:

> The conduct of Mr. Wees is more extensive than merely converting a debtor's handwritten materials into typed form, which is what *Mitchell* validates.... Particularly, in his assistance to the Debtors in classifying secured and unsecured debt, identifying possible exemptions, and completing the chapter 13 plan, Wees goes well beyond what § 110 allows and what [Idaho law on unauthorized practice] allows.

244 B.R. at 471 (citations omitted).

The Court identified the conduct that ran afoul of the prohibition on unauthorized practice. This included, among other things, providing a comprehensive list of available exemptions, determining where property and debts would be scheduled, and summarizing and reformulating information solicited from customers;[12] para-

---

11. As discussed further below, that section prohibits a BPP from using the word "legal" or any similar term in any advertisements, or advertising under any category that includes the word "legal" or any similar term.

12. *See* 244 B.R. at 471, citing *Ostrovsky v. Monroe (In re Ellingson)*, 230 B.R. 426, 433–34 (Bankr.D.Mont.1999).

phrasing and explaining bankruptcy concepts in order to obtain information from customers which would be inserted into bankruptcy forms;[13] and using bankruptcy software in order to convert a customer's raw information into usable form, and advising a customer of available exemptions from which to choose.[14] The Court concluded:

> Wees is similarly engaged in the unauthorized practice of law. He is not saved by his use of preprinted bankruptcy forms or bankruptcy software which automatically placed the information he solicited from the debtors into the appropriate schedule. Wees' approach requires debtors to rely on his judgment as to the forms required to successfully file and prosecute a bankruptcy case, his use of computer software to ensure that information is correctly disclosed, and his resources as to what exemptions

were available and the legal authorities supporting those claims.

244 B.R. at 472.[15]

Some two years have passed, but the record before the Court indicates that Mr. Wees' present conduct is virtually indistinguishable from that which *Farness* found to be improper and prohibited. Mr. Wees provides no real excuse for his continued behavior after *Farness*.[16]

Mr. Wees also makes it clear that he has a fundamental disagreement with prohibitions and limitations on nonlawyers assisting *pro se* litigants. These include, but are not limited to, those arising under § 110 and the case law construing it.[17] But he is required to conduct himself within the bounds of the law as it exists, not as he believes it should be.

Mr. Wees makes no cogent or credible argument that the state of the law has changed from that addressed in *Farness*.

---

13. *Id.*, citing *Samuels v. American Legal Clinic, Inc. (In re Samuels)*, 176 B.R. 616, 619 (Bankr.M.D.Fla.1994).

14. *Id.*, citing *In re Kaitangian*, 218 B.R. 102, 110 (Bankr.S.D.Cal.1998).

15. Express mention was made of the problem of Mr. Wees directing customers to exemption authority, and assisting them with their claiming of exemptions. 244 B.R. at 472, citing *Patton v. Scholl*, 1999 WL 431095 (E.D.Pa. 1999):

> [t]he choice of appropriate exemptions based on raw data provided by debtors is an exercise in legal judgment, and advising debtors to accept particular exemptions is legal advice. Regardless of what means Patton employed to select exemptions for each debtor, whether consultation with a computer program, a textbook, or other prepared materials, Patton performed legal services for [debtors] when he chose their exemptions.

> *Id.* at *9.

16. He seems to feel that his greater reliance on the actual schedules and statement of af-

fairs is a change from the earlier questionnaires. However, it is clearly not a significant nor sufficient change given the manner in which Mr. Wees uses those forms as he consults with and advises his customers. *See, e.g.*, n. 7, *supra*. And a focus on use of official forms does not conceal or mitigate the wholly improper approach to advising debtors regarding their possible exemptions.

17. Mr. Wees testified that he was engaged in defense of an action in the Idaho state courts related to contentions that he engaged in the unauthorized practice of law. *See* Idaho Code § 3–420. He indicated that a magistrate judge found this state statute void for vagueness, but that the district court overturned that decision. The Court was advised that the matter was on appeal to the Idaho Supreme Court, but had not yet been resolved. A portion of Mr. Wees' briefing appears to repeat or adopt arguments aimed at the enforcement of § 3–420 in the Idaho courts. Those issues are not before this Court. To the extent Mr. Wees renews such constitutional arguments *viz* § 110, this Court will rely on its holding in *Farness*. *See* 244 B.R. at 469.

In point of fact, the case law has developed in a fashion wholly consistent with *Farness*.[18] Current judicial analyses of these § 110 issues reinforces each of *Farness'* holdings.

### B. Post-*Farness* case law

■ BPP's may type forms, and can properly perform essentially no other service. A more expansive approach to the role of BPP, such as that advocated and pursued by Mr. Wees, not only violates several provisions of § 110 but also constitutes the unauthorized practice of law. A review of just a few of the more recent cases serves to illustrate this point.

*In re Dunkle*, 272 B.R. 450 (Bankr. W.D.Pa.2002) found that a BPP who classified debtors' obligations as secured, unsecured or priority; classified and selected their exemptions; determined the existence of co-debtors or executory contracts; and transferred data from questionnaires into the final bankruptcy forms required for filing, engaged in the unauthorized practice of law, and violated § 110. As here, the BPP in *Dunkle* had been previously alerted to the problem by way of a prior reported decision and, as here, failed to change his practices. *See* 272 B.R. at 456, referring to *In re Lyvers*, 179 B.R. 837 (Bankr.W.D.Ky.1995). A permanent injunction issued. *Id.*

*In re Schneider*, 271 B.R. 761 (Bankr. D.Vt.2002) also emphasized the "extremely limited" services that a BPP can provide consistent with the statute. *Id.* at 763–64. The court stated:

[T]he BPP moves at his or her peril when performing any service beyond that of simply typing the information provided by a prospective debtor on approved bankruptcy forms. This Court

acknowledges that § 110 authorizes a BPP to assist debtors in completing the bankruptcy petition and related forms, but it does so by narrowly circumscribing permissible activities.

*Id.* at 764. In that case, the BPP avoided sanction only by avoiding any counseling or advice to the debtors regarding choice of chapter, selection of state or federal exemptions, or the completion of their forms. *Id.* In reaching this conclusion, the court made the finding that "the legal decisions requisite to the completion and filing of the debtors' bankruptcy petition and related documents were made *exclusively* by the debtors in this case." *Id.* (emphasis supplied).

The bankruptcy court in *In re Landry*, 268 B.R. 301 (Bankr.M.D.Fla.2001) provided a summary of what was prohibited, and what was proper:

The type of compensable services that a bankruptcy petition preparer can render are extremely limited. Petition preparers, who by definition are not attorneys, cannot give legal advice or otherwise engage in the unauthorized practice of law. *In re Guttierez*, 248 B.R. 287, 296, n. 25 (Bankr.W.D.Texas 2000) (*See* cases cited therein). Clearly, as recognized by the District Court, a bankruptcy petition preparer cannot assist the debtor in completing forms, provide legal advice that would assist a prospective debtor in making determinations as to which type of bankruptcy to file or which exemptions to take, or direct clients to particular legal publications or specific pages so that they can attempt to find legal answers on their own. The very act of directing a prospective debtor to review a particular section of a legal book in and of itself constitutes legal advice. By focusing

---

**18.** Mr. Wees elected not to address any of the case law, indicating that he found nothing favorable to his position in it. *See* Brief, Doc. No. 28 (Bush), at p. 2.

on one answer and excluding others, the bankruptcy petition preparer steps over the line. As stated by the District Court, "Legal advice is legal advice, whether it comes directly from the petition preparer or indirectly via, for example, a bankruptcy treatise being recited by that preparer. Persons seeking legal assistance tend to place their trust in an individual purporting to have expertise in that area." *Florida Bar v. Brumbaugh*, 355 So.2d 1186 (Fla.1978).

Therefore, a bankruptcy petition preparer can expect to receive compensation only for secretarial-type services. As stated by the United States [Bankruptcy Court] for the Western District of Texas in *Guttierez:*

> So what does § 110 tacitly permit? The answer in a nutshell is "not much." Section 110 itself proscribes virtually all conduct falling into the category of guidance or advice, effectively restricting "petition preparers" to rendering only "scrivening/typing" services. Anything else—be it suggesting bankruptcy as an available remedy for a debtor's financial problems, merely explaining how to fill out the schedules, or answering questions about exemptions or whether a claim is or is not secured will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of § 110. The only service that a bankruptcy petition preparer can safely offer and complete on behalf of a pro se debtor after the enactment of § 110 is the "transcription" of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service. Any other service provided on behalf of the debtor by a non-attorney (even telling the debtor where the information goes on the form) is not permitted under state unauthorized practice of law statutes, and so is also not authorized by § 110.

*Guttierez*, 248 B.R. at 297–98. Thus, under § 110, the services a bankruptcy petition preparer can provide are extremely limited.

A bankruptcy petition preparer *can* meet a prospective debtor, provide forms or questionnaires for the debtor to complete *without* any assistance from the bankruptcy petition preparer, transcribe the information supplied by the prospective debtor on the applicable bankruptcy forms without change, correction, or alteration, copy the pleadings, and gather all necessary related pleadings to file with the bankruptcy court. The bankruptcy petition preparer cannot improve upon the prospective debtor's answers, cannot counsel the client on options, and cannot otherwise provide legal assistance to the prospective debtor, directly or indirectly. However, to the extent the bankruptcy petition preparer provides the limited secretarial-type services, the preparer is entitled to receive reasonable compensation.

268 B.R. at 304–05 (emphasis in original).

Like Mr. Wees, the BPP in *In re Moffett*, 263 B.R. 805 (Bankr.W.D.Ky.2001), claimed to eschew giving legal advice; she even had her customers sign disclosures, like those used here, in which the customers acknowledged that they weren't receiving legal advice. But the BPP still made independent elections about what would be shown in the pleadings, explained exemptions to debtors and gave one debtor a list of what could be exempted, assigned or identified the appropriate exemption statutes, and answered questions posed about what should be disclosed in the forms and how. The court found all such conduct to

be improper and to constitute the unauthorized practice of law. 263 B.R. at 813–16.[19] The court made an insightful observation: a common factor in many cases finding unauthorized practice by a BPP is the advising debtors about exemptions, determining which exemptions may apply to a debtor's property, and assisting debtors in asserting these exemptions in the schedules, including citation to statutory authority. *Id.* at 814.

The BPP in *Moffett* was also found to have violated § 110(f)(1), which prohibits use of "the word 'legal' or any similar term," by advertising herself as a "paralegal." 263 B.R. at 813, citing *In re Gomez*, 259 B.R. 379 (Bankr.D.Colo.2001). The *Gomez* court held that the term "paralegal"

> incorporates the proscribed term "legal" and connotes specialized legal expertise or knowledge. Petition preparer advertising must steer clear of any suggestion that the preparer will be offering legal services or insights.

*Id.* at 385.

*Moffett* also rejected the BPP's use of and reliance on computer software, her use of questionnaires,[20] and her application of her own practical experience and access to generally available legal materials in order to assist debtors with their exemptions. 263 B.R. at 815. It quoted once again from *Gomez:*

Then by using a patchwork of legal resources, reference to years of legal experience and a computer program, they embellish the illusion that prospective debtors receive the essential legal assistance necessary to obtain bankruptcy relief. This makes the disclosure to Ms. Gomez that Colorado Legal Works is not an attorney and cannot provide legal advice particularly deceptive and misleading. The [BPP] simultaneously dispense advice which has potentially profound consequences while attempting to disclaim any responsibility for the advice given.

263 B.R. at 815–16, quoting 259 B.R. at 387.[21]

These cases among others [22] fully support the conclusion that Mr. Wees has transgressed the limits of § 110 in multiple regards.

## C. Violation of § 110

### 1. Implicated provisions

Several subsections of § 110 are at issue here. Section 110(f)(1), as noted earlier, provides:

> (f)(1) A bankruptcy petition preparer shall not use the word "legal" or any similar term in any advertisements, or advertise under any category that in-

---

19. The Court also found that this BPP violated § 110(g)(1) in accepting filing fees from debtors and conveying them to the court. 263 B.R. at 812.

20. "The Court agrees that the use of a bankruptcy questionnaire to prepare a petition is the unauthorized practice of law, as transferring information from the questionnaire to the official bankruptcy forms invariably will require some legal judgment." *Id.* at 815.

21. This Court would add that, under the circumstances addressed in *Gomez* and *Moffett*, and those presented here, the quality and

effectiveness of any disclaimer executed by debtors is nil.

22. In addition to those discussed herein and in *Farness*, the following merit review. *Iowa Supreme Court Commission on Unauthorized Practice of Law v. Sturgeon*, 635 N.W.2d 679 (Iowa 2001); *In re Kangarloo*, 250 B.R. 115 (Bankr.C.D.Cal.2000); *In re Adams*, 214 B.R. 212 (9th Cir. BAP 1997); *Hastings v. United States Trustee (In re Agyekum)*, 225 B.R. 695 (9th Cir. BAP 1998); *In re Pinkins*, 213 B.R. 818 (Bankr.E.D.Mich.1997).

cludes the word "legal" or any similar term.

Each violation of § 110(f)(1) results in a mandatory fine of up to $500.00. § 110(f)(2).[23]

Next, § 110(i)(1) provides, in pertinent part, that:

[I]f a bankruptcy petition preparer violates this section or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court, and the district court on motion of the debtor, the trustee, or a creditor and after hearing, shall order the bankruptcy petition preparer to pay to the debtor—

(A) the debtor's actual damages;

(B) the greater of—

(i) $2,000; or

(ii) twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services; and

(C) reasonable attorneys' fees and costs in moving for damages under this subsection.

Section 110(j) provides:

(j)(1) A debtor for whom a bankruptcy petition preparer has prepared a document for filing, the trustee, a creditor, or the United States trustee in the district in which the bankruptcy petition preparer resides, has conducted business, or the United States trustee in any other district in which the debtor resides may bring a civil action to enjoin a bankruptcy petition preparer from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer.

(2)(A) In an action under paragraph (1), if the court finds that—

(i) a bankruptcy petition preparer has—

(I) engaged in conduct in violation of this section or of any provision of this title a violation of which subjects a person to criminal penalty;

(II) misrepresented the preparer's experience or education as a bankruptcy petition preparer; or

(III) engaged in any other fraudulent, unfair, or deceptive conduct; and

(ii) injunctive relief is appropriate to prevent the recurrence of such conduct, the court may enjoin the bankruptcy petition preparer from engaging in such conduct.

(B) If the court finds that a bankruptcy petition preparer has continually engaged in conduct described in subclause (I), (II), or (III) of clause (i) and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, or has not paid a penalty imposed under this section, the court may enjoin the person from acting as a bankruptcy petition preparer.

Section 110(k) provides:

(k) Nothing in this section shall be construed to permit activities that are otherwise prohibited by law, including rules and laws that prohibit the unauthorized practice of law.

Finally, the Court has the ability, under § 110(h)(2), to disallow and order the disgorgement of any fee paid a BPP which is "found to be in excess of the value of services rendered for the documents prepared." Such disallowed fees must be turned over to the chapter 7 trustee, how-

---

**23.** Amounts assessed for violation of § 110(f)(1), like those for violation of §§ 110(b)(1), (c)(1), (d)(1), (e)(1) and/or (g)(1), constitute fines. *See* §§ 110(b)(2), (c)(3), (d)(2), (e)(2), (f)(2) and (g)(2). They are payable to the United States.

ever debtors are allowed to seek to exempt such funds. *Id.*

## 2. Nature of violations

The Court concludes, on the record and evidence presented, that Mr. Wees has violated § 110 in several regards.

He violated § 110(f)(1) in his use of the term "legal." In using this term in the trade name "Self–Help Legal Alternatives" and in his characterization of his role and status as a "paralegal," Mr. Wees not only violates the proscription of § 110(f)(1), he also has engaged in a practice and committed acts which are unfair and deceptive. This violates § 110(i)(1) and § 110(j)(2)(A)(i)(I) and (III).

Further, Mr. Wees has and continues to engage in the unauthorized practice of law. This conduct is not only a violation of § 110(k), it is also unfair and deceptive within contemplation of § 110(i) and (j).

### a. "Legal" and "paralegal"

■ *Farness* identified the problem with the name "Self–Help Legal Alternatives" and concluded a violation of the Code existed. The Court imposed a single $500.00 fine under § 110(f)(2). *See* 244 B.R. at 469.

Mr. Wees did not alter his conduct. The name remained the same, and by his admission he continued advertising using this trade name for some period. He indicates that *after* the hearing in the instant matters, he changed the corporate name. One

might suspect a change in the trade name is not far behind. But the violation occurred prior to any such remedial acts.

Mr. Wees states in his Reply Brief:

As respondent has ceased further advertising using the word "legal" in his name and advertisements, the Court should show leniency toward respondent, and not impose a fine, but instead give respondent fair warning as to future conduct and actions.

*See* Doc. No. 35 (Bush), at p. 9. Mr. Wees already had fair warning. He elected to continue under that same trade name for the two years from *Farness* to the date of hearing in the instant cases. The belated post-hearing change of the corporate name is not a satisfactory response.

Additionally, the Court now expressly finds and holds that Mr. Wees' use of the word "legal" within the term "paralegal" is also violative of § 110(f)(1). *See Gomez,* 259 B.R. at 385 (the term paralegal "connotes specialized legal expertise or knowledge" and its use violates the letter and spirit of the Code's prohibition); *see also, Moffett,* 263 B.R. at 813–14; *Kaitangian,* 218 B.R. at 107–08; *Fessenden v. Ireland (In re Hobbs),* 213 B.R. 207, 215 (Bankr. D.Me.1997).[24]

And not only does Mr. Wees tell his clients that he is a paralegal, he represents to them that he is a "certified" independent paralegal according to what he displays in his office.[25] This sends an un-

---

24. That this "advertising" is on a sign in the office or waiting room, rather than in a media ad or on a billboard, is of not consequence. *See In re Desilets,* 247 B.R. 660, 674 (Bankr. W.D.Mich.2000); *see also, Moffett,* 263 B.R. at 813 (term "paralegal" on business cards); *Kangarloo,* 250 B.R. at 121 (business cards and signage). It is the communication to the prospective debtor of the suggestion that legal services, expertise, knowledge or insight is offered that is of concern.

25. The Court has significant doubt regarding the proposition that there can be "independent" paralegals. The "Model Guidelines for the Utilization of Legal Assistant Services" adopted by resolution of the Idaho State Bar, and Idaho Rules of Professional Conduct 5.3 and 5.5(b) reflect that attorney supervision is absolutely required. *Accord, Moffett,* 263 B.R. at 814 (discussing similar rules of Kentucky Supreme Court, limiting paralegal to providing legal advice and services only un-

mistakable message to the customer regarding his legal acumen and ability, and the benefits to be obtained from utilizing his services. Even worse, the "certification" is nothing more than a purchased *imprimatur* from a group that does no testing, evaluation or "certification." In both part and parcel, these are deceptive and misleading acts.

Therefore, Mr. Wees violates both § 110(f)(1) which prohibits use of the term "legal" in any advertisement, but also § 110(i)(1) and § 110(j)(2)(A) which prohibit fraudulent, unfair or deceptive acts.

■ Each violation of § 110(f)(1) exposes Mr. Wees to a fine of $500.00. *See* § 110(f)(2). The Court could be justified in assessing not just a $1,000.00 fine based on the two instant cases, but instead a fine reflective of all the cases over the two years since *Farness* provided "fair warning." However, given other consequences of his conduct, as set out hereinbelow, the Court will limit the monetary sanction for violation of § 110(f)(1) to $1,000.00. The fine will be payable to the Clerk of the Court.

### b. Unauthorized practice of law

■ There is no doubt whatsoever that Mr. Wees has violated §§ 110(i), (j) and (k). He has engaged in the unauthorized practice of law, and has clearly exceeded the bounds of proper BPP services under the Code. Doing so amounts to a fraudulent, unfair and deceptive practice,[26] as customers are led to believe they are receiving something they cannot legitimately receive from Mr. Wees.

In his testimony, during which he described how he chooses to perform his BPP work, and in his post-hearing submissions in which he attempts to justify that behavior and the reasonableness of the amounts he charges, Mr. Wees admitted facts which unequivocally show that his services exceed the permissible limits of the statute.

Mr. Wees does not merely type what the debtors elect to provide. He assists them, and he steers them with his worksheets and "pro se" materials. He manipulates their raw data into a form he believes comports with the requirements of law.

It is perhaps easiest to see how the Code's proscriptions are violated by looking at exemptions. Mr. Wees provides his customers with a worksheet which identifies for them exemptions which he believes are available under Idaho law. He identifies for them the Idaho Code sections which give rise to the exemptions. He identifies the amounts available under each exemption. He even elects for his customers the answer to the question on schedule C asking whether they wish to claim federal instead of state exemptions. In doing all this, he not only violates § 110, he engages in the unauthorized practice of law.

This is not a new concern. *Farness* explained the problem in detail, and Mr. Wees at that time avoided the consequences of his unauthorized practice of law only by virtue of how the U.S. Trustee elected to pursue issues in that particular case.

Violation of any of the provisions of § 110 gives rise to liability under §§ 110(i) and (j). In particular, the finding of this Court that Mr. Wees has engaged in unfair and deceptive acts and practices requires the Court to certify that fact to the Dis-

---

der the supervision and direction of a licensed lawyer).

**26.** *See Dunkle,* 272 B.R. at 456; *Moffett,* 263 B.R. at 813; *Gomez,* 259 B.R. at 386–88; *Guttierez,* 248 B.R. at 294.

trict Court. § 110(i)(1). The District Court may thereafter on motion of debtor, trustee or a creditor assess actual damages, and the greater of $2,000 or twice the amount of the BPP fee paid, and reasonable fees and costs. § 110(i)(1)(A)—(C). The Court will, as required, certify the matter.

■ The Court will also enter an injunction, pursuant to and under § 110(j).[27] The Court determines that Mr. Wees has violated §§ 110(j)(2)(A)(i)(I) and (III). Pursuant to § 110(j)(2)(A)(ii), the Court finds injunctive relief necessary and appropriate to prevent recurrence.

The Court will enjoin Mr. Wees: (i) from using the name "Self–Help *Legal* Alternatives" in any advertising, signage, listing, directory or materials provided customers or prospective customers; (ii) from using the term "paralegal" in such ways or manners, and specifically including but not limited to the advertising or representation of his status as a "paralegal" or a "certified paralegal"; (iii) from advising or assisting customers in the completion of their bankruptcy forms, specifically including but not limited to provision of information regarding exemptions; and (iv) from performing any service other than the typing of information which the customer, without assistance from him, may independently prepare and provide.

In the event this injunction is not honored or proves ineffective, the Court will reserve jurisdiction to consider further and other remedies, specifically including injunction under § 110(j)(2)(B) prohibiting Mr. Wees from acting as a BPP.

### 3. Charges for performing BPP work

■ This Court has for some time generally accepted the idea that a fee of up to $150.00 was appropriate for BPP work. This figure first arose in *Mitchell. See* 97.1 I.B.C.R. at 6.[28] However, the time has come to clarify the question, and the amount, of presumptive BPP fees.

A BPP can rightfully perform for debtors only the modest service of transcribing or typing bankruptcy forms that the debtors alone must prepare without assistance. The development of the law makes clear that other sorts of services are improper, and those services can *perforce* not be compensated. The charging of a fee which is in excess of the value of a BPP's properly limited services can, in and of itself, mislead debtors into believing that they are receiving (or are entitled to receive) services in excess of what § 110 actually allows.

*Moffett* adopted an approach to the compensation issue which rejected the $150.00 charged by the BPP and instead concluded that $20.00 per hour, with a maximum fee of $100.00, was reasonable. 263 B.R. at 816. *Guttierez* allowed up to $50.00 in total fees. 248 B.R. at 299.[29]

---

**27.** The fact that § 110(j)(1) provides the debtor, trustee, creditor or U.S. Trustee with the ability to bring such an action does not limit the Court from acting. *See* § 105(a). The Court declined to enter an injunction in *Farness,* due in part to the UST's election not to seek such relief and in consideration of providing an opportunity to Mr. Wees to modify his practices. The Court does not decline to act today.

**28.** It is unfair to lay the presumptive fee solely at the feet of *Mitchell.* In that case, the Court determined that BPP compensation could reasonably be evaluated in relation to what a legal secretary would charge, and used a rate of $25 per hour. It appears that a $150 figure was reached only due to the allegation, which was unchallenged in that case, that 6 hours of preparation time was required.

**29.** *Landry* surveyed a number of decisions discussing the compensation issue. *See* 268 B.R. at 308. It ultimately arrived at an ap-

The Court concludes that the proper reference point is what professional typists or word processors would charge. These are the kinds of services most comparable to what a BPP may legally do. Mr. Wees' arguments that he should be paid for the "value added" to this function is and must be rejected, since he is prohibited from providing those services.

The information submitted by the parties establish rates from $12 per hour [30] to $17.74 per hour (the effective local wage of a legal secretary, per Mr. Wees' Affidavit), to $25 per hour.[31] A legal secretary certainly might perform roughly comparable typing tasks, as *Mitchell* some time ago noted. However, the Court has concerns about using the statistical approach Mr. Wees applied to arrive at an hourly wage figure since (a) other types of services may be performed by a legal secretary, and (b) other benefits may be paid by such a secretary's employer. This could impact the calculated amount. BPP's work outside a law office, and are independent business persons. The Affidavits of Ms. Atwell and Ms. Williams are therefore deemed more probative.

The hourly rates of Ms. Atwell and Ms. Williams are not the full story. While Ms. Atwell charges about twice as much per hour, she estimates that she would require 2 hours ($50) in the Buckway case and 2.5 hours ($72.50) in the Bush case to prepare the pleadings. Ms. Williams, though charging a lower rate, would estimate slightly under 5 hours ($58) in the Buckways' case, and 5 hours ($60) in Ms. Bush's case. Both would charge extra for any photocopies desired.[32]

Here, the average of Ms. Atwell's and Ms. Williams' estimates in the Buckways' case is $54.00. The average of their estimates in Ms. Bush's case is $66.25. The Court concludes these averages are an appropriate gauge of what is reasonable, given all the facts and circumstances. Mr. Wees charged $150.00 in each case, and thus will be ordered to reimburse the Buckways' estate $96.00 and Ms. Bush's estate $83.75. § 110(h)(2).

The reasonableness of a given BPP charge is a factual matter which can only be determined on a case by case basis. The applicant bears the burden of establishing the reasonableness of fees charged, and that this burden would in-

proach that allowed $75 per hour but based that figure on what paralegals in the local market charged. This Court respectfully disagrees. The rates charged by paralegals is irrelevant to what a BPP may charge, since BPP's are prohibited from providing paralegal services. The proper analogy is to professional typing or document production services.

30. Affidavit of Tina Williams of Expert Typing, a typing and secretarial service, Doc. No. 22 (Buckway case); Doc. No. 26(Bush case).

31. Affidavit of Sherry Atwell of Idaho Business Centre, a typing and secretarial service, Doc. No. 19 (Buckway case); Doc. No. 23 (Bush case).

32. It is conceivable that a BPP could prepare the paperwork (which includes, under

§ 110(d)(1), one copy) but the debtor thereafter use a commercial copy service for making copies needed for filing. The Court sees no reason to assume that multiple copies are necessarily part of a base BPP charge.

The U. S Trustee correctly notes a risk that a BPP might attempt to increase the effective compensation for services by inflating copy charges, and that debtors might be persuaded to pay such charges either because they are hidden within a flat fee or because of the convenience of using the BPP to make copies. In order to avoid abuse, any copy charges of a BPP should be separately disclosed and not in excess of commercial services in the area.

These are not matters of concern in the present cases. Mr. Wees made no charge for copies.

clude proof of an appropriate hourly rate, and of the time reasonably required for the task. *Accord,* §§ 330(a)(3)(A), (a)(3)(B). Still, there is much to be said for presumptive amounts, which might help avoid unnecessary litigation.

 Given what the Court has seen in these two cases, and on the evidence presented by the litigants, a fee in the range of $50 to $60 would appear presumptively reasonable given the "normal" consumer bankruptcy case. As with all presumptions, there is no prohibition on inquiry, whether generated by a debtor, the U.S. Trustee, parties in interest, or the Court, in order to determine what fee the facts and circumstances of a given case might justify. *Accord, In re Gebert,* 99.4 I.B.C.R. 137, 138 (Bankr.D.Idaho 2000) (similar approach to the "presumptive" chapter 13 fee for debtors' attorneys).

**CONCLUSION**

The Court finds and concludes that Wees has violated § 110(f)(1) by using the word "legal" in advertising his trade name and in promoting his "paralegal" qualifications. Accordingly the Court will order Mr. Wees to pay, under and pursuant to § 110(f)(2), a sanction of $1,000.00. Such sanction shall be paid to the Clerk of the Court.

The Court further finds and concludes that the fee paid to Wees by the Debtors, under all the circumstances, is unreasonable and in excess of the value of services rendered. The Court will order Mr. Wees to pay $83.75 to Ms. Bush's Trustee and $96.00 to the Buckways' Trustee. § 110(h)(2).

The Court further finds and concludes that Mr. Wees' actions constitute the unauthorized practice of law, and constitute fraudulent, unfair and deceptive conduct. Pursuant to and under § 110(k), and §§ 110(j)(1) and (j)(2)(A), the Court will enter an injunction, in the form described above, and require Mr. Wees to conform his BPP services to the law. If he fails to adhere to such injunction, the Court will consider a complete injunction, under § 110(j)(2)(B), barring any further BPP services by Mr. Wees.

The UST shall prepare an appropriate form of order.