**In re Kevin J. DOSER and Laura E. Doser, Debtors.**

**No. 01–03630.**

United States Bankruptcy Court, D. Idaho.

Originally Filed July 3, 2002.

Amendment Filed July 24, 2002.

Richard Lubetzky, Los Angeles, California and John P. Connolly, Connolly & Smyser, Boise, Idaho, for Judith M. Scott, d/b/a We the People Forms & Service Center of Boise.

Jeffrey G. Howe, Boise, Idaho, Assistant U.S. Trustee.

Richard Crawforth, Boise, Idaho, Chapter 7 Trustee.

## AMENDED MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background and Introduction

Judith M. Scott does business in Boise as "We the People," a sole proprietorship. Ms. Scott prepares legal documents for her customers, including bankruptcy petitions, schedules and statements, for a fee. Kevin and Laura Doser retained Ms. Scott to prepare the legal pleadings necessary to file for relief in this Court under Chapter 7 of the Bankruptcy Code. They paid Ms. Scott $199.00 for the bankruptcy papers,

and another $15.00 for photocopies. The Dosers filed their bankruptcy case with this Court on December 4, 2001.

While they are the debtors who initiated this bankruptcy case, this decision does not involve any examination of the Dosers' acts, assets or debts.[1] Instead, the Court's findings, conclusions and comments that follow focus upon the practices of, and fees charged by, Ms. Scott. In connection with a routine review of the Court's files, the Court discovered Ms. Scott's written disclosure of compensation filed in this case. Docket No. 2. Based upon the Court's familiarity with the fees charged in the dozens of cases filed annually with the help of non-lawyer bankruptcy petition preparers ("BPPs"), Ms. Scott's disclosure gave the Court pause. From the information contained in the disclosure, it appeared to the Court that Ms. Scott's total fee ($214.00) was as high, if not higher, than the Court had previously encountered in an Idaho bankruptcy case for BPP services. Because of this, the Court was concerned that the fee may be excessive in relation to the value of the typing services a BPP may legitimately perform. Alternatively, the Court was apprehensive that the BPP in this instance, in order to justify a high fee, may have provided services in excess of those permitted by the Bankruptcy Code and other applicable law. While no interested party had objected to the BPP fees at that time, the Court felt compelled to act on its own.

On December 27, 2001, the Court issued its Order to Petition Preparer to Show

Cause ("OSC") directed to Ms. Scott. Docket No. 4. The OSC notified Ms. Scott that,

> It ... appears from the record that the compensation paid by Debtors to said Judith M. Scott, $214.00, may be in excess of the reasonable value of the service she rendered, and in excess of that charged by several other bankruptcy petition preparers in this District. In addition, in light of the amount of the fee charged by Judith M. Scott, it appears to the Court there may be some question whether the services provided by said Judith M. Scott have been limited to those appropriate under applicable law.

OSC at 2, Docket No. 4. The OSC required Ms. Scott to appear before the Court at a hearing to show that she had not violated the relevant Bankruptcy Code restrictions "with respect to the nature of the services she has provided and/or the amount of the compensation she has been paid by and received from the ... Debtors in this case." *Id.* at 3. The OSC also invited Ms. Scott, if it were her desire, to appear at the hearing with counsel, and to make written submissions to the Court concerning this matter.

The hearing on the OSC took place on February 19, 2002. Ms. Scott personally appeared, along with her two attorneys.[2] The Assistant U.S. Trustee for Idaho, Jeff Howe, Esq., also appeared and participated at the hearing, as did the Chapter 7 trustee in the Doser case, Rich Crawforth.

---

1. The record reflects that on March 25, 2002, Dosers received a discharge of the debts in the bankruptcy case. Docket No. 17. No other proceedings appear to be pending in that case. In other words, Dosers have likely achieved the fresh financial start that presumably was their goal in seeking protection of the bankruptcy laws.

2. Richard Lubetzky, Esq. of Los Angeles, California, acted as "lead" counsel for Ms. Scott at the hearing. John Connolly, Esq. of Boise served as local counsel in sponsoring Mr. Lubetzky's admission *pro hac vice* and also personally appeared at the hearing for Ms. Scott. The identity of counsel is mentioned not only for clarity, but because it is relevant to the issues.

Ms. Scott testified in response to the questions posed by her lawyer, the other parties and the Court. Ms. Scott's lawyer also called another witness to testify, Chelsea Thompson, a representative of a local typing service. The Court admitted a number of written exhibits into evidence, both at the hearing and thereafter by stipulation of the parties. *See* Stipulation filed Mar. 15, 2002, Docket No. 15, and Order re Exhibits filed Mar. 20, 2002, Docket No. 16. In addition, after the hearing, counsel for Ms. Scott and the U.S. Trustee each submitted lengthy written legal arguments and briefing for consideration by the Court. The issues raised by the OSC were thereafter taken under advisement.

After a careful review of the record, the evidence and testimony, and after due consideration of the arguments of the parties, the Court intends this Memorandum to constitute its findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

## II. Facts

As noted above, Debtors Kevin and Laura Doser hired Ms. Scott to act as their BPP in connection with filing for bankruptcy relief, and they paid her a total of $214.00 for her services. Based upon the evidence and testimony adduced at the hearing on the OSC, it appears their case was processed by Ms. Scott in the same fashion as she handles all her bankruptcy customers. Therefore, the description of Ms. Scott's mode of operation below applies not only to Dosers, but generally in the other cases where she has provided debtors with bankruptcy services.

Ms. Scott holds a contractual franchise to operate her "We the People" legal forms business in the Boise area. Her franchisor is, apparently, "We the People Forms and Service Centers, Inc.," (hereinafter "the Franchisor") a corporation, whose primary offices are located in California. Ms. Scott opened her business in August 2001. The bankruptcy "products" she sells, or in other words, the forms that she and the Franchisor charge their customers to complete, are provided by the Franchisor. In addition to the cost of purchasing her franchise, Ms. Scott pays a portion of her gross revenue to the Franchisor. In turn, she and the Franchisor agree on the price Ms. Scott charges her customers for completed bankruptcy forms. While Ms. Scott suggests otherwise in her briefing, in effect, she and the Franchisor split the fees she receives from her bankruptcy customers.[3]

In determining what to charge for her bankruptcy services, Ms. Scott testified she consulted the staff at the office of the Clerk of the Court, she researched what bankruptcy petition preparer services operating on the Internet charge, and she looked at fee disclosures filed by other BPPs in Idaho cases. As a result of her research, Ms. Scott became aware that another Boise BPP was charging $150.00 for his services.[4] Ms. Scott and the Franchisor jointly decided to charge $199.00 for preparation of the bankruptcy documents, and $15.00 for each additional copy of the

---

**3.** Interestingly, Ms. Scott testified that she must pay the Franchisor its share of any amounts she collects for reimbursement of the "copy costs" for making her customers any extra copies of the documents.

**4.** While the Court will not hold it against her, Ms. Scott's reliance upon what the "other" Boise BPP was charging as indicative of an appropriate rate for her services was mis-

placed. Ms. Scott, in doing her research, evidently did not discover that the amount of that individual's fees, as well as his conduct, had, and has since, been criticized by this Court, and his fees ordered reduced. *See In re Farness*, 244 B.R. 464 (Bankr.D.Idaho 2000); *In re Bush*, 275 B.R. 69 (Bankr.D.Idaho 2002).

paperwork requested by the customer. While the Court is admittedly speculating on this point, apparently because Ms. Scott and the Franchisor concluded their services offered additional benefits to customers compared to others providing BPP services in the District, she and the Franchisor deemed the rate selected as an appropriate one.[5]

As the Court understands the evidence, Ms. Scott's method of providing BPP services to customers, and to Dosers, follows this model. When a potential customer comes into her shop in Boise, Ms. Scott reminds the customer that she is not an attorney and that she cannot give the customer legal advice. This disclaimer is also prominently portrayed on signs in her office and on the "purchase order" the customer must sign to engage her services. Moreover, Ms. Scott testified she never personally counsels a customer on whether they need bankruptcy relief, or on the availability or comparative advantages of relief under the different chapters of the Bankruptcy Code, such as Chapter 13. The Court believes Ms. Scott in this regard, since her business sells Chapter 7 paperwork exclusively, so she is not interested in helping any customers for whom Chapter 13 may be the best choice.[6]

When the customer has decided to file for Chapter 7 relief, and assuming the customer wants to hire Ms. Scott to prepare the petition, schedules, statement of affairs and the like, she has the customer sign a contract which she calls a "purchase order." *See* Stipulation, Ex. A, Docket No. 15. This document has some interesting terms. The contract recites that the customer is purchasing "the services of 'We the People' in order to complete a bankruptcy form with information supplied by the Customer ...." *Id.* It also states that "[a]ny fees pursuant to this purchase order are for forms, computer time, [and] typing ...." *Id.* In other words, Ms. Scott's own contract contemplates that she is not being retained to provide additional services for the customer.

The contract also requires the customer to assume sole responsibility associated with preparation of the documents and to hold We the People and its agents harmless from any and all liability in connection with the transaction. Nothing in the evidence and testimony really helps the Court in understanding the breadth or significance of this attempt by the contract to shift all risk of loss to the customer for any damages, including, apparently, those occasioned by Ms. Scott or the Franchisor. The contract then specifies that if any dispute arises between the BPP and the customer, "venue" for that dispute shall "lie in Santa Barbara County, California." *Id.* Again, the reason for this provision was not explained at the hearing.[7]

---

5. A discussion of the alleged comparative benefits of Ms. Scott's services comes later in this Memorandum.

6. In one sense, the Court commends Ms. Scott on her restraint in resisting the temptation to recommend Chapter 7 over other chapters when inevitably asked by her customers. On the other hand, Ms. Scott's inability to offer advice means, occasionally, she will help a debtor file for Chapter 7 relief that will not benefit, and may even be prejudiced, by such choice. Chapter 13 allows the debtor to retain non-exempt property, and to discharge a broader range of debts, and thus may often be better suited for some individuals when compared to Chapter 7. Regrettably, the Court often sees *pro se* Chapter 7 debtors who could have benefitted from an attorney's help in filing for relief under Chapter 13.

7. The Court is confused why Ms. Scott would be interested in going to California to resolve any legal disputes with her local customers. The Court doubts Ms. Scott appreciates the significance of such provision, and speculates the decision to include this provision was made by the Franchisor.

In addition to signing a purchase order, the customer must pay Ms. Scott in full before any bankruptcy forms will be generated. The Dosers did so. When paid, Ms. Scott gives the customer two separate documents. One is a questionnaire she refers to as the "Workbook," which contains questions about the customer's assets, debts and financial affairs. Stipulation, Ex. C, Docket No. 14. When completed, the Workbook supplies the information necessary for We the People staff in California to "process" the bankruptcy forms. Ms. Scott's understanding is that this questionnaire asks for the same information as the official forms for a bankruptcy petition, schedules, and statement of financial affairs, but the Workbook's questions are, according to Ms. Scott, "simpler to answer."

Once the customer completes the information in the Workbook, he or she returns it to Ms. Scott. She checks the information, but only for "completeness and legibility." In describing her role in this fashion, Ms. Scott explains she merely ensures the customer has included a response to every question in the Workbook, or has left a blank space intentionally. She also makes sure the customer's information can be read by the California word processors. She then faxes the completed questionnaire to, in her words, the "paralegals" at the "processing center" operated by the Franchisor in California. The Franchisor's personnel process the information and convert it into the required bankruptcy forms. The finished forms are then electronically transmitted to Ms. Scott, who in turn prints a hard copy of the forms and invites the customer to come in and sign the paperwork. As was the case with Dosers, once the documents are signed, Ms. Scott takes the original papers to the Clerk where she files them. She requires the customer to give her a money order made payable to the Clerk for the filing fee, which Dosers did. She files the documents for the customers at the courthouse, and then mails a copy of the forms to the debtors showing the filing stamp.

In addition to the Workbook, Ms. Scott gives the customer a publication called "Bankruptcy Overview—Chapter 7 Idaho." Hearing Exhibit No. 1 (hereinafter "Overview"). This twenty-page booklet was prepared and provided to Ms. Scott by the Franchisor along with instructions that she give it to her customers. This brief publication contains a very general discussion about several Chapter 7 bankruptcy concepts and procedures (e.g., Overview, "What is Bankruptcy" at 2; "Discharge" at 6). Also included are what the Franchisor apparently has concluded are helpful, if not altogether prudent, tips on how customers can effectively represent themselves in their soon-to-be-filed bankruptcy case. For example, the manual at one point advises that "[i]f the Trustee or a creditor becomes abusive [at the creditors' meeting,] . . . refuse to answer any more questions until you are treated civilly." Overview at 8. Later, the booklet comforts potential debtors by telling them "[d]on't be nervous at the prospect of answering questions. If you were careful in the preparation of your papers, all should go well." Overview at 9.[8]

---

**8.** These comments can, in the Court's opinion, be fairly characterized as "advice" about the bankruptcy process. · They hardly seem relevant to the process of completing the forms necessary to file for bankruptcy relief. The cited commentary also contemplates that, at least sometimes, "all" may not "go well" for *pro se* debtors at the creditor's meeting, and that some answers provided by debtors in haste under the pressure of examination by the trustee or a creditor may expose debtors to some risk. The Court concurs with this implication; what goes on at a creditors meeting can have a significant, sometimes

The Overview also contains some detailed, substantive material. One section is titled "Idaho Exemptions." That section informs the reader that all exemptions allowed under Idaho law are listed in a chart in the book, and that "[i]f exemptions are not listed, then you will not be entitled to keep the items of property." Overview at 12. A three-page "chart" is then included detailing how the available exemptions can be inserted in the appropriate places in the customers' bankruptcy schedules.

Ms. Scott testified she considers the Overview, a publication which her customers keep, to be a valuable benefit for them. She feels it is particularly helpful because it was prepared by the "general counsel" of the Franchisor, and "reviewed and approved" by John Connolly, the Boise lawyer who serves as the "supervising attorney" for her business. Ms. Scott also feels that Mr. Connolly's role and participation in her business activities is an attribute that sets We the People apart from other BPP businesses, and in significant part, justifies her particular fees.

Mr. Connolly's relationship and role in Ms. Scott's practice is, in the Court's opinion, somewhat unconventional. Mr. Connolly is retained and paid by the Franchisor. As the written franchise materials make clear, Mr. Connolly's "client" is the California corporation, not Ms. Scott. However, Mr. Connolly's duties apparently include advising Ms. Scott, as a franchisee, on Idaho law and court procedures, and reviewing all the forms she uses in her business. According to Ms. Scott, she presumes Mr. Connolly reviewed all the bankruptcy forms she uses, and she presumes they all comply with any local rules or requirements.[9] Ms. Scott pays $200.00 per month to the Franchisor for the various services provided by her "supervising attorney."

More importantly, under the We the People system, Mr. Connolly also performs services for Ms. Scott's customers. In particular, the Overview reminds customers that they "enjoy the right, as a We the People customer, to chat with our Supervising Attorney, at no additional cost to you." Overview at 7. Ms. Scott testified that her paying customers have the privilege of contacting Mr. Connolly (presumably by phone), and of asking him "general" questions about bankruptcy. She cautions them, though, that they cannot ask the lawyer "specific" questions about their particular cases. While she is adamant she tells all her customers about this limitation, Ms. Scott had considerable difficulty at the hearing articulating the difference between "general" and "specific" bankruptcy law questions, so much so that the Court sincerely doubts she could effectively explain the distinction to a customer. Moreover, Ms. Scott failed to indicate whether she explains to her customers that Mr. Connolly does not "represent" the customers' interests, as they might reasonably expect when she and the Franchisor invite them to talk to him.

Ms. Scott exhibits considerable pride in the services she provides her customers, and in the Court's opinion, she genuinely feels she is not engaged in the unauthorized practice of law and that her fees are fair. Moreover, the quality of the "product" produced by Ms. Scott and the Fran-

---

negative, impact on a debtor's right to bankruptcy relief. However, the Overview does not attempt to advise debtors of the potential problems that can occur at the creditors' meeting.

9. It was not established on the record whether Mr. Connolly's duties also including appearing in Court to defend Ms. Scott's fees and practices, or whether he did so in his role as counsel for the Franchisor.

chisor in this case is not at issue. The bankruptcy forms she and the Franchisor provided to Debtors seem legally adequate.

If all Ms. Scott did was to "process" Debtors' forms, the Court would have little concern with the nature of her services. By contrast, the services she provided in this case, and that she presumably provides for others filing for bankruptcy relief, involve much more, however. As a result, Ms. Scott's practices are problematic under the Bankruptcy Code. Moreover, Ms. Scott is legally entitled to collect a reasonable fee for only those services she can properly provide. Her concept of the "added value" she allegedly delivers to her customers, compared to other BPPs, is also a point of contention here.

### III. The Applicable Law

This Court is fortunate in this case because it need not plow much new ground concerning the subject of BPP compliance with the Bankruptcy Code, even within this District. There is abundant guidance available to the Court in the Bankruptcy Code and cases. Not only has Congress provided the statutory framework against which to measure a BPP's activities and fees, but the Ninth Circuit and the other judges in this District have spoken to the issues raised here as well.

Section 110 of the Bankruptcy Code, enacted in 1994 to protect consumers, regulates the conduct of BPPs. 11 U.S.C. § 110. For a discussion of the purpose and policies embodied in this statute, the Court commends the reader to review two decisions by Judge Myers: *In re Bush*, 275 B.R. 69 (Bankr.D.Idaho 2002), and *In re Farness*, 244 B.R. 464 (Bankr.D.Idaho 2000). These decisions also chronicle, at least in part, the avalanche of judicial pronouncements condemning activist BPPs. Much of what is important here concerning the extent of proper BPP services is contained in this succinct observation by the Court in *Farness:*

[T]he statute's main purpose is to protect consumers from abuses by non-lawyer petition preparers. The key to § 110 is that a petition preparer may provide typing services, but may not in the guise thereof advise debtors of their rights and options or otherwise engage in the practice of law. This Court in [*In re Mitchell*, 97.1 I.B.C.R. 5, 6 (Bankr.D.Idaho 1997)] recognized the distinction:

Document preparers are not attorneys ... The task to organize information and type it, is something that a trained legal secretary can do, no more and no less. A document preparer may not give legal advice... Consequently, a document preparer should be compensated in the same fashion, and in the same amount as a legal secretary.

By virtue of the provisions of § 110, and case law construing and applying those provisions (including, in this District, *Mitchell*), petition preparers ... are on notice of the limits of their authority, and the potential consequences should they transgress those limits.

*Farness*, 244 B.R. at 467 (citations omitted).

While § 110 forbids specific kinds of BPP conduct, in the spirit of protecting the consumers of bankruptcy services in general, the statute also prohibits BPPs from engaging in any "fraudulent, unfair or deceptive act," 11 U.S.C. § 110(i)(1), including the unauthorized practice of law, 11 U.S.C. § 110(k). The statute also prescribes potential penalties for violators, including recovery of a debtor's damages, and allows for the imposition of an injunction against the offending BPP. 11 U.S.C. § 110(i), (j). In addition, the statute directs the Court to "disallow and order the

immediate turnover to the bankruptcy trustee of any fee . . . found to be in excess of the value of the services rendered for the documents prepared." 11 U.S.C. § 110(h)(2). Sanctions shall also be imposed if the BPP collects or receives any payment from the debtor for the court fees in connection with filing the petition. 11 U.S.C. § 110(g)(1).

This discussion paints with a broad brush. The Court will now focus on the specific issues presented in this case.

## IV. Disposition of the Issues

### A. Fairness of the OSC Procedure

■ To begin, the Court will address Ms. Scott's argument that the process employed by the Court in measuring her conduct and fees against the Code in this case was unfair.[10] No doubt, due process requires that Ms. Scott receive fair notice of the Court's concerns, and a reasonable opportunity to be heard before the Court acts. While it was reviewed above, the Court will revisit the course taken by this matter to demonstrate why the Court respectfully disagrees that Ms. Scott was prejudiced by the procedure employed in this case.

The Court is charged with enforcing the provisions of § 110 of the Bankruptcy Code.[11] In reviewing the file in this case, the Court observed, based upon her written disclosure, that Ms. Scott had charged

Debtors $214.00 for acting as Debtors' BPP. This is a higher fee than charged by a BPP in this District, based upon this bankruptcy judge's experience. The amount of Ms. Scott's fee suggested to the Court that there was potentially, and absent more information, cause for concern either that the fee was excessive for proper BPP services, or that this particular BPP had provided more services to the Debtors than allowed by the Code. To confront these questions in an open, direct fashion, on December 27, 2001, the Court ordered Ms. Scott to appear before the Court at a future date. In its OSC, the Court explained its interests:

> [i]t . . . appears from the record that the compensation paid by Debtors to said Judith M. Scott, $214.00, may be in excess of the reasonable value of the services she rendered, and in excess of that charged by several other bankruptcy petition preparers in the District. In addition, in light of the amount of the fee charged by Judith M. Scott, it appears to the Court there may be some question whether the services provided by said Judith M. Scott have been limited to those appropriate under applicable law.

OSC at 2. The OSC expressly recites that it is issued under authority, in part, of 11 U.S.C. § 110. *Id.* The OSC directs Ms. Scott to appear to show cause why the Court should not find she has

---

10. This Court is privileged to serve with an extremely civil local bar. In his brief, Mr. Lubetzky, Ms. Scott's attorney from California, characterizes these proceedings as "akin to an ambush." Respondent's Post Hearing Mem. at 2, Docket No. 19. To be sure, the Court is not accustomed to this sort of "hardball" advocacy. In the Court's opinion, counsel's choice of images adds little to the quality of his argument. The Court presumes no disrespect was intended by the comment, and in deciding the issues, will focus solely on the merits of counsel's legal position.

11. So that Ms. Scott does not feel abused by Congress, she should know that the Code also requires this Court to independently review the fees of any professional (*e.g.*, lawyer, accountant, investment adviser) employed in connection with a bankruptcy case to ensure the professional has complied with the statute and has not charged excessive fees. 11 U.S.C. §§ 328, 329(b), 330(a).

violated the terms and provisions of 11 U.S.C. § 110 and other applicable law with respect to the nature of the services she has provided and/or the amount of the compensation she has been paid by and received from the . . . Debtors in this case.

*Id.* at 3. In addition, Ms. Scott was invited to make written submissions to the Court concerning these matters in advance of the hearing, and to appear at the hearing with counsel, both of which she elected to do. *See* Declaration of Judith M. Scott in Response to Order to Petition Preparer to Show Cause, filed January 8, 2002, Docket No. 7; Supplemental Declaration of Judith M. Scott in Response to Order to Petition Preparer to Show Cause, filed Feb. 15, 2002, Docket No. 12.

At the hearing, in its introductory remarks, the Court explained to those appearing that the bankruptcy judges in this District have periodically engaged in examining "in particular, the amount of the fees being charged by petition preparers, and more generally, the practices of petition preparers." Tr., p. 4, lines 22–24. The Court suggested that Ms. Scott testify at the hearing, but also, in comments directed to her attorneys, offered that "if you have additional evidence or testimony or witnesses that you'd like to present, you're going to be allowed as much opportunity as you need to do that." Tr., p. 7, lines 7–10. In fact, Ms. Scott called an additional witness to testify. Tr., pp. 95–102.

After the hearing, the Court ordered the record augmented by the submissions attached as exhibits to the parties' Stipulation. Order re Exhibits, ¶ 2, Docket No. 15. In addition, Ms. Scott's attorneys filed extensive written briefing. Docket Nos. 19, 22.

In retrospect, Ms. Scott's argument that she was not given fair notice of the issues or a fair opportunity to be heard in this case is perplexing and seems to ignore the course of these proceedings. As set forth above, Ms. Scott was given both written and oral notice by the Court concerning the potential issues to be addressed at the hearing, all of which, generically, could be gleaned from even a cursory reading of § 110 of the Bankruptcy Code, a statute the Court presumes Ms. Scott and her attorneys considered at length before they commenced their Idaho operations. Ms. Scott was afforded ample time to prepare for the OSC hearing (*i.e.*, approximately seven weeks), and given unlimited time at the hearing before the Court to present evidence and testimony.[12] Her protest about the procedure, under these circumstances, lacks merit.

Ms. Scott also challenges, and asks for reconsideration of, the Court's decision denying her motion to include two additional post-hearing affidavits in the evidentiary record in this matter. *See* Order re Exhibits, ¶ 1, Docket No. 16. Ironically, Ms. Scott argues that unless these out-of-court written statements are admitted in evidence, the proceedings are rendered unfair. However, it is the unfairness of Ms. Scott's approach to submitting additional testimony that was the basis for the Court's refusal to allow them in the evidentiary record. Without regard to whether the substance of the affidavits is

---

12. As an example, when the Court had concluded its questions to Ms. Scott, the Court invited counsel for Ms. Scott to ask additional questions. The following exchange occurred:
"The Court: [Counsel], do you have additional questions you'd like to ask Ms. Scott?

Counsel: And just a few, Your Honor.
The Court: Be my guest and you're not limited to a few. Go ahead and take the time you need."
Tr. p. 80, lines 17–21.

relevant, whether the affiants are competent to testify, or whether the material in the affidavits is otherwise admissible, the statements contained therein clearly constitute prohibited hearsay. Fed.R.Evid. 801(a)-(c); 802. As the Court indicated in its written order, because these witnesses had not been made available for cross-examination by the U.S. Trustee and Chapter 7 Trustee in this case, and because the Court was afforded no opportunity to ask the witnesses questions about their out-of-court statements, it would be inappropriate for the Court to consider them. Therefore, Ms. Scott's belated request to reconsider exclusion of the affidavits is denied.

Ms. Scott's argument that the procedure used to examine her conduct and fees in this case was defective is respectfully rejected.

### B. Who is the BPP?

Before going further, the Court observes that one critical player in this case is not technically before the Court: We the People Forms and Service Centers, USA, Inc., Ms. Scott's franchisor. The Bankruptcy Code defines "bankruptcy petition preparer" to include "a person, other than an attorney or an employee of an attorney, who prepares for compensation a document for filing ...." 11 U.S.C. 110(a)(1). In this case, the Franchisor certainly seems to come within this definition.

Ms. Scott's testimony demonstrates she and the Franchisor are engaged in a joint enterprise preparing bankruptcy forms for a fee for debtors in this District. She operates the local office and meets with customers. However, the record shows the manner in which she does so is subject to significant control and restrictions placed upon her by her operating agreement with the Franchisor. The Franchisor prepares and dictates the written information she may distribute to her customers, all of which has been reviewed both by the Franchisor's corporate counsel and its Idaho attorney. The Franchisor employs and pays the local "supervising attorney" made available to Ms. Scott and to her customers. The Franchisor approves what Ms. Scott can charge for her services and products. The existence of these sorts of contractual controls renders this operation, in the Court's opinion, a combined enterprise.

More importantly for these purposes, however, is the role played by the Franchisor in the actual preparation of documents for filing in Idaho. Recall, Ms. Scott solicits and initially collects the information for inclusion in the bankruptcy pleadings from the customer. When it is received, she makes no changes to that information, checking only for completeness and legibility. The information is then faxed to the Franchisor, who employs "paralegals" to do the actual word processing to convert the customer's questionnaire to finished bankruptcy papers. The finished product is sent electronically to Ms. Scott, who prints hard copies, and has the customer ink the pleadings for filing. Ms. Scott "splits" the fee for this service, paying the Franchisor twenty-five per cent of what she receives from each bankruptcy customer.[13] Under these facts, the Franchisor can certainly be seen, utilizing the

---

**13.** Counsel for Ms. Scott reminds the Court that under the parties' agreement, the Franchisor receives a percentage of Ms. Scott's gross revenues, not a fee on a case-by-case basis. The Court understands the argument, but concludes, in the context of the language and purpose of § 110, such amounts to a distinction without a difference, especially given the Franchisor's right to approve the fees charged by Ms. Scott to bankruptcy customers. While the record is somewhat unclear on the point, the Franchisor may even get a share of the "copy costs" Ms. Scott charges the bankruptcy customers.

language of the statute, as "preparing documents for filing for a fee."[14]

Admittedly, the Franchisor has not been formally offered its day in court. It would be inappropriate for the Court to attempt to adjudicate the Franchisor's status under the § 110 definition. However, based upon the record developed thus far, it seems the Franchisor, by contract, has in large part dictated the manner in which Ms. Scott operates, and by its conduct, has played an active role in each bankruptcy case handled by Ms. Scott, to the point of actually preparing the substance of the final bankruptcy papers for filing in this District. The Franchisor has not filed the written disclosure or provided the information required by §§ 110(b) and (c) in this case, nor presumably in Ms. Scott's other cases, and therefore, as a separate entity from Ms. Scott, may be in violation of the Bankruptcy Code. In this day and age of computer word processing and electronic transmission of information, the Court will not presume that Congress intended the requirements of § 110 be so easily skirted by multi-state BPP operations. While the Court enters no orders here concerning the Franchisor, it should take heed that its method of doing business may amount to a violation of the Bankruptcy Code.

Moreover, in the opinion of the Court, Ms. Scott may also walk a fine line in operating in this fashion without more disclosure to her customers. She is, arguably, merely the local distributor of the products and services of a foreign corporation. Granted, while Ms. Scott has the direct contact with the customer, she is not personally responsible for, nor based upon her testimony, even knowledgeable about the process used to produce the "end-merchandise" for the customer: the bankruptcy forms. She also does not know whether the information she is providing her customers via the Overview is accurate and complete, other than she has been told it is by the Franchisor and the Franchisor's lawyers. Ms. Scott apparently did not disclose, either to these Debtors or to others she helps, that she is "farming out" the actual preparation of the final bankruptcy pleadings to a separate entity. Absent such disclosures, the customers are presumably relying upon Ms. Scott to provide the services they need in compliance with the law. That reliance may be misplaced. The Bankruptcy Code prohibits her and the Franchisor from engaging in any fraudulent, deceptive or unfair conduct. 11 U.S.C. § 110(i)(1). Given Congress' intent that § 110 serve to protect the consumer, and since Ms. Scott's customers may be invited to erroneously assume they are dealing strictly with a local BPP, the Court suggests that both Ms. Scott and her Franchisor proceed with caution.

Lacking the participation in this case of the Franchisor, the Court renders no final conclusions concerning the Franchisor's status under § 110, nor as to the joint venture's vulnerability for failure to fully disclose the important details of their operation to their customers. If necessary, resolution of such issues will await further proceedings.

## C. Participation of the "Supervising Attorney" Constitutes a Deceptive and Unfair Practice

In the Court's view, there is reason for concern regarding the somewhat amor-

---

**14.** Interestingly, on Debtors' statement of financial affairs filed in this case, which document was prepared by Ms. Scott and the Franchisor, Debtors indicate in response to Question No. 9 that they made a payment to *both* We the People—Boise and We the People—USA prior to their bankruptcy filing for services. Because only the $214 is listed for the amount of the payment, the Court presumes no separate payment was made to the Franchisor beyond its share of the money tendered by Debtors to Ms. Scott.

phous relationship established by Ms. Scott between her "supervising attorney" and her bankruptcy customers. Because of the issues arising from this arrangement, the Court concludes Ms. Scott's mode of operation is deceptive and unfair to potential debtors for several reasons.

First, the record shows the Idaho attorney does not formally represent Ms. Scott's clients. As her "supervising attorney," Mr. Connolly was selected and is paid by the Franchisor. Ms. Scott, in turn, pays the Franchisor $200.00 per month for access to the services and advice of this lawyer. Ms. Scott's franchise documents recite that this attorney does not "represent" Ms. Scott's interests, although she has access to, and is in fact required to consult with him. This lawyer must review the forms she uses in her business, and she asks him questions about the law and court procedures, including bankruptcy matters. More importantly, Ms. Scott and the Franchisor are adamant this lawyer does not represent Ms. Scott's bankruptcy customers. Yet, it is undisputed that Ms. Scott in person, and the Franchisor through the written materials it prepared for distribution to customers, expressly instruct the customers to contact this lawyer for advice. And while she suggests that her customers talk to Mr. Connolly, Ms. Scott has great difficulty in explaining the types of questions the attorney can answer for them.

The record shows both Ms. Scott and the Franchisor hype the availability of the supervising attorney as an advantage to customers who deal with We the People as compared to other BPPs: "In addition, don't forget that you enjoy the right, as a WE THE PEOPLE customer, to chat with our Supervising Attorney, at no additional cost to you." Overview, Exhibit 1 at 7. Ms. Scott also testified she explains to customers that if they employ her, they will have access to a lawyer to answer "general questions" about the law and bankruptcy procedure. Tr. p. 11, line 23—p. 13, line 7; p. 52, lines 19–23.

In the Court' opinion, the customers' "right" to "chat" with the attorney about "general questions" should provide them little comfort, and adds no real value to Ms. Scott's services. Instead, the Court concludes this arrangement may lead her customers to believe that, because of the association of an attorney with the process, Ms. Scott's approach to processing their bankruptcy forms is more beneficial and reliable than others providing similar services. Any such reliance is illusory in several respects.

Ms. Scott testified that the blank forms she prepares for her customers have been reviewed by the local attorney to ensure compliance with the Court's local rules of practice. Tr. p. 60 line 15—p. 62, line 2. However, the content and format of the forms used to petition for bankruptcy relief are prescribed by the Judicial Conference of the United States. For the most part, parties must use the "official forms" in bankruptcy cases. Fed. R. Bankr P. 9009. These forms are available, free of cost, on dozens of Internet sites, including this Court's web site, www.id.uscourts.gov. Hard copies of the official forms may also be obtained from the Clerk for nominal cost. Unless counsel is involved in reviewing the substantive information inserted in the forms by the BPP and her customers, something Ms. Scott denies (Tr. p. 84, line 19—p. 85, line 1), there is no real advantage to customers by having an attorney "available" to Ms. Scott to "review forms" used in connection with her operation. Either the forms Ms. Scott and the Franchisor use are consistent with the official forms, or they are not. In truth, the bankruptcy forms Ms. Scott uses are mere templates; no "review" of Ms. Scott's cus-

tomers' forms is needed. Only the data provided by the customer changes from case-to-case. As a result, customers gain no advantage because Ms. Scott has a lawyer available to "review" and approve her blank forms.[15]

Next, there is no real advantage to customers having access to the lawyer to "chat." The written "Overview" handed out by Ms. Scott to customers contains a general discussion of Chapter 7 law and procedure, a feature of her practice which, as discussed below, is also problematical. Ms. Scott acknowledges she understands that the local attorney cannot ethically respond to any questions specific to her customers' circumstances, although she had trouble explaining to the Court the difference between "general" legal questions the attorney can answer, and "specific" questions he cannot. Once again, unless the attorney is exceeding the role described by Ms. Scott at the hearing, little real benefit can result from a discussion between the customer and the lawyer.

Of course, the Court's comments presume the lawyer is not actually engaged in giving legal advice to Ms. Scott's clients for a fee. If, on the other hand, the lawyer is actually proffering specific legal counsel to the prospective debtors, he almost certainly doing so in violation of applicable rules of professional conduct.[16] If it is occurring, such activity could not be condoned by the Court. The lawyer would also likely be running afoul of the Bankruptcy Code's disclosure requirements if engaged in such activities.[17]

However, even assuming in this instance the lawyer is acting with appropriate restraint, the Court concludes Ms. Scott's customers are potentially mislead by this arrangement. While customers are encouraged to exercise their "right" to "chat" with the lawyer about their bankruptcy problems, no attempt is made to inform them they can not, and in fact should not, rely upon the lawyer's advice in the traditional manner where a client seeks counsel from an attorney. Absent the existence of an attorney-client relationship, Ms. Scott's customers are at risk if they think they are receiving reliable, personal guidance about bankruptcy law. By necessity, the information the lawyer provides them is no more customized or trustworthy than they could obtain consulting a book at the library. The Court concludes Congress did not intend that a BPP require customers to attempt such complex distinctions.

In short, the Court finds and concludes that Ms. Scott's practice of referring her customers to her "supervising attorney" is deceptive and unfair and violates § 110.

### D. Unauthorized Practice of Law

#### 1. The "Overview"

The Court also refuses to condone a BPP's attempt to provide legal advice to prospective debtors by giving them a pamphlet or other publication about bankruptcy law and procedure, and recommending that they use the book to answer their questions in filling out their bankruptcy forms. As this Court previously pointed out in cases where the BPPs provided their customers copies of national

---

**15.** Once again, referring to the forms as "hers", is probably imprecise in this case. The Franchisor is responsible for preparing the finished forms. Ms. Scott merely delivers them to the customers.

**16.** I.R.P.C. 1.7(b); *see also* I.R.P.C. 4.1(a), 4.3.

**17.** 11 U.S.C. § 329(a) requires that any attorney representing a debtor in connection with a bankruptcy case file a written disclosure with the Court detailing all compensation arrangements and transactions involving the debtor. *See also* Fed. R. Bankr.P.2016(b).

publications far more comprehensive than Ms. Scott' s "Overview":

> [A] bankruptcy petition preparer cannot . . . direct clients to particular legal publications or specific pages so that they can attempt to find legal answers on their own. The very act of directing a prospective debtor to review a particular section or a legal book in and of itself constitutes legal advice. By focusing on one answer and excluding others, the bankruptcy petition preparer steps over the line. As stated by the District Court, "Legal advice is legal advice, whether it comes directly from the petition preparer or indirectly via, for example, a bankruptcy treatise being recited by that preparer. Persons seeking legal assistance tend to place their trust in an individual purporting to have expertise in that area." *Florida Bar v. Brumbaugh*, 355 So.2d 1186 (Fla.1978).

*In re Bush*, 275 B.R. at 78–79, (quoting *In re Landry*, 268 B.R. 301, 304–305 (Bankr. M.D.Fla.2001)). *See also In re Farness*, 244 B.R. at 472, n. 10 (observing "while a pro se debtor might elect to buy such [bankruptcy law] guides, petition preparers may not insulate their unauthorized practice [of law] by pointing debtors to such materials.") (citing *Samuels v. American Legal Clinic, Inc. (In re Samuels)*, 176 B.R. 616, 623 (Bankr.M.D.Fla.1994) and *In re McCarthy*, 149 B.R. 162, 167 (Bankr.S.D.Cal.1992)).

As in the other cases, here Ms. Scott's practice of distributing her publication to her customers is fraught with the potential for confusion and damage. The "Overview" utilized by Ms. Scott suffers from its brevity in attempting to advise nonlawyers about an extremely complex area of the law. One obvious criticism of suggesting customers rely upon this pamphlet is that "[t]he decision whether or not to file bankruptcy is a difficult one . . .", Overview at

2. While attempting to explain the nature of a Chapter 7 liquidation case, Overview at 4, the publication fails to alert customers to the possible benefits of seeking relief available to debtors under Chapter 13 through a debt repayment plan. While Ms. Scott acknowledges that it would be inappropriate for her to advise clients about the relative benefits of Chapter 13, she evidently feels it appropriate to refer her customers to a written reference which omits mention of Chapter 13 altogether. The Court wonders why, if Ms. Scott's customers possess the legal acumen to have independently decided that Chapter 7 is preferable in their circumstances over Chapter 13, they need be given a publication that describes, albeit incompletely, what Chapter 7 is all about?

The discussion of discharge in the Overview is another example of the risk inherent in relying upon Ms. Scott's publication. Describing exceptions to discharge, the Overview succinctly observes:

> As a general rule . . . all debts in a Chapter 7 Bankruptcy are discharged. Those [sic] exceptions include alimony and support obligations, certain taxes, debts incurred by fraud, embezzlement, larceny, willful malicious injury, debts arising from driving while intoxicated, and certain educational loans.

Overview at 7. This attempt to acknowledge the existence of a few of the kinds of debt excepted from discharge in Chapter 7 is generally accurate, as far as it goes. However, without a discussion of the various elements of proof required to establish that a debt is excepted from discharge under one of the grounds mentioned, the list in incomplete in its simplicity. In addition, the Overview fails to alert customers that § 523(a) actually contains seventeen different statutory exceptions to discharge. Not even mentioned in Ms. Scott's publication are, for exam-

ple, unscheduled debts, certain types of fines and penalties owed to governmental units, obligations owed to a former spouse arising out of divorce, and restitution awards. By omitting any of these kinds of debts, potential debtors run the risk of filing for Chapter 7 relief, only to be frustrated in their efforts to obtain a "fresh start."

Of course, any discussion of the comparative benefits of Chapter 13 versus Chapter 7, or any comprehensive explanation of the various kinds of debt excepted from discharge in bankruptcy, would be lengthy and complicated, and it is doubtful most nonlawyers could be expected to appreciate the nuances associated with bankruptcy law. But that's the point: by giving her customers a short, summary description of the topic, Ms. Scott may lead them to believe that the decision whether to seek Chapter 7 relief is one they can effectively make without counsel, something which may be far from correct. On the other hand, if Ms. Scott gives her customers a detailed, comprehensive discussion of the legal issues they may encounter in a bankruptcy case, those customers will likely be overwhelmed and confused. This existence of this dilemma serves as strong counsel against BPPs being allowed to give out written legal advice to customers.

The Overview, while short on substance in most instances, offers too much advice in other areas:

> [S]ome Trustees demand that debtors surrender their credit cards on the spot [at the Section 341(a) creditors meeting]. The bankruptcy law does not authorize that, and an acceptable response is to refuse, telling the Trustee to take it up with the Judge.

Overview at 8. In the Court's opinion, the above excerpt is almost laughable. While the Bankruptcy Code relieved bankruptcy judges of the responsibility of presiding over creditors meetings years ago, the Court is unaware of an instance, ever, in which a trustee in this District has demanded that a debtor surrender credit cards at a creditors meeting. The Court is proud of what it has observed to be the civil, professional manner in which the Chapter 7 trustees operate in this District, and is aware of no single incident where they have been accused of acting in the heavy-handed fashion described in the Overview, or otherwise. Perhaps Ms. Scott's supervising attorney, who she indicates is familiar with Idaho bankruptcy practices and has approved the content of the Overview, may be better informed than the Court. Or perhaps the description in the Overview relates to incidents in southern California, the Franchisor's principal place of business. Regardless, the Court doubts the scene described by this excerpt, suggesting that an Idaho debtor may encounter an overzealous trustee intent on acting outside his or her legal authority, is any sense accurate.[18]

It is clear on this record that in giving them the Overview, Ms. Scott recommended, either expressly or impliedly, that her bankruptcy customers consult this publication as accurate and reliable information for use in filing for bankruptcy and completing their forms. BPPs may not make such suggestions consistent with their proper role as transcribers of bankruptcy forms. This is the sort of recommendation that constitutes prohibited legal advice in this context. Bankruptcy is a complicated area of the law. As a BPP,

---

18. Moreover, if Ms. Scott truly believes her customers should expect this sort of treatment from the trustee at a creditors meeting, the Court wonders how the Overview can recommend in good faith that Ms. Scott's customers proceed without an attorney to protect their rights.

Ms. Scott is in no position to know, what more to advise others, whether a given publication is a reliable and accurate bankruptcy law resource, or whether the pamphlet contains enough information about the subject to answer her customers' critical questions. Even were this book accurate and complete, its distribution for use by the BPP's customers in this fashion constitutes the unauthorized practice of law, and amounts to a deceptive and unfair practice in violation of § 110.

### 2. Use of the "Workbook"

■ The U.S. Trustee points out that Ms. Scott does not have her customers simply fill out blank copies of the bankruptcy schedules to return for processing, and instead uses a form of questionnaire, which Ms. Scott and the Franchisor refer to as the "Workbook." The use of questionnaires or worksheets in collecting the information for the BPP to use in preparing bankruptcy papers for filing has been criticized by this Court and others. *See In re Bush*, 275 B.R. at 83; *In re Farness*, 244 B.R. at 471–72 and the cases cited therein. Attempts through a questionnaire to "simplify" the questions posed and information required in the official bankruptcy forms usually leads to the exercise of judgment by the BPP in how best to accomplish that result, which in turn inevitably crosses the line by giving potential debtors guidance and advice on how to fill out the forms. To the extent the questionnaire deviates in any way from the official forms, it likely constitutes unauthorized legal advice.

In this case, the Court acknowledges that the substance of Ms. Scott's Workbook comes close to a mere recitation of the same questions and information contained in the official forms, so much so the Court doubts filling out the Workbook is any "simpler" than filling out the official forms. There are some deviations from the official forms, however, which bear mention.

■ For example, the Workbook, in collecting data regarding the customer's personal property, solicits the customer's opinion of the "quick-sale value" of the items. This is at odds with the instructions contained in Official Schedule B, which requires a debtor to list the "current market value" of each item. While the Court suspects some debtors may actually use a liquidation or "garage sale" value as their opinion on the market value of their household goods when filing for bankruptcy, the Workbook's endorsement of the use of that method, as compared to market value, is inappropriate.

The Workbook also directs the customer to list any "animals" he or she may own, as is required by official Schedule B. The Workbook instructs the customer to list "Farm, not pets" in this regard. To the Court, this is a curious suggestion. While the typical family pet will usually be of little interest to the customer's creditors, the official form makes no such distinction, instead requiring full disclosure of the debtor's assets, whether valuable or not. Conceivably, the "family pet" could be a rare breed with considerable resale value, or in this part of the world, the customer may not consider his or her pet horse to be a "farm animal," [19] even though it could be liquidated for a substantial sum. There is simply no basis for the Workbook's suggestion that the customers omit family pets from disclosure.

---

**19.** This observation is not made in jest. Whether the family horse should be accorded treatment as a "pet" in the context of a bankruptcy case has already been the subject of at least one reported decision in this District. *In re Gallegos*, 226 B.R. 111 (Bankr.D.Idaho 1998).

There are other examples of problems with the Workbook. For some reason not apparent to the Court, the Workbook advises customers not to list government-guaranteed student loans as unsecured debts, while of course the official forms require a complete list of all the debtor's obligations. The Workbook also instructs debtors to list only the "net income" received from second jobs in the budget information. The Court could find nothing in the official forms, Schedule I, that allows omission of information about a debtor's gross income, and the withholdings from that income, simply because the debtor has more than one job.

■ The concerns with the Workbook identified above may seem harmless enough, even insignificant, when considered in isolation. However, together these glitches demonstrate the risks inherent in the BPP's election to use its own questionnaire, instead of the official forms, in processing a customer's information for a bankruptcy filing. And depending upon the facts of a given case, the BPP's attempts to "help" customers complete the forms via the instructions to the Workbook, while arguably well-intentioned, can easily constitute prohibited legal advice. In this case, the Court concludes use of the Workbook, in its present form, may cause a potential debtor prejudice, and represents a deceptive and unfair practice in violation of § 110. If Ms. Scott and the Franchisor insist on using a "workbook" instead of the official forms in their business, in order to comply with the Bankruptcy Code such a tool must religiously adhere to the format and substance of the forms prescribed by the Rules.

### E. Accepting the Filing Fee Check

■ The U.S. Trustee also condemns Ms. Scott's practice, in connection with filing Debtors' bankruptcy case, and as a standard practice in her business, of accepting a money order from the customer payable to the Clerk of the Court to pay filing fees. The U.S. Trustee points out that several courts have held that this practice violates § 110(g)(1), which provides that a BPP shall not "collect or receive any payment from the debtor ... for the court fees in connection with filing the petition." *See, e.g., In re Green,* 197 B.R. 878, 879–881 (Bankr.D.Ariz.1996) (concluding that where BPP took possession of the filing fee and controlled the ultimate filing of the petition, the BPP violated § 110(g)(1)). Ms. Scott responds to the U.S. Trustee's contention by noting other courts have construed the statute to allow this practice. *E.g., In re Reed,* 208 B.R. 695, 696–698 (Bankr.N.D.Cal.1997) (holding that § 110 only prohibits BPP from accepting money for its own account to cover the filing fee). No Ninth Circuit appellate guidance exists regarding this issue. Because the issue is squarely presented, it must be addressed.

The legislative history for § 110 is sparse. However, what there is indicates Congress was concerned that "[w]hile it is *permissible for a petition preparer to provide services solely limited to typing,* far too many of them provide legal advice and legal services to debtors. These preparers often *lack the necessary legal training and ethics regulation* to provide such services in an adequate and appropriate manner." H.R.Rep. No. 103–834, 103d Cong., 2d Sess. 40–41 (1994) (emphasis added). A careful reading of this concise statement reveals much.

First, in adopting the various proscriptions of § 110, Congress intended that a BPP's services were to be "solely limited to typing." Next, Congress expressed its concern that BPPs lack "legal training and ethics regulation." If the U.S. Trustee's interpretation of the statute is correct, did

Congress overact by prohibiting a BPP from taking responsibility for delivering the debtor's paperwork and filing fee check to the Clerk of the Court? Ms. Scott thinks so, and argues that if the statute is so interpreted, the scope of the remedy adopted by Congress greatly exceeded the potential for harm.

The bankruptcy court in *Reed* thoughtfully notes that under another provision of § 110, in subsection (i)(1), a BPP can be sanctioned for "failure to file bankruptcy papers" and so the statute, at least arguably, "implicitly recognizes" that a BPP may file documents with the bankruptcy court. *Reed,* 208 B.R. at 697, n. 4. *Reed* then observes that "under the U.S. Trustee's construction of § 110(g)(1), if a preparer is to file a debtor's bankruptcy petition, the check for the filing fee would have to be delivered to the bankruptcy court by separate conveyance so that it remains in the debtor's 'control'." *Id.* at 697. Because this reading of the law could unduly complicate and confuse the process of filing for bankruptcy, the *Reed* court believed that "such a construction is not a reasonable one." *Id.*

Recall, § 110(g)(1) only prohibits a BPP from receiving funds from the debtor in connection with filing the petition. Presumably, consistent with § 110, a BPP may be hired by a debtor to type and file documents other than the petition commencing a debtor's bankruptcy case, such as the schedules and statement of financial affairs, motions and responses, and even pleadings in adversary proceedings in which the *pro se* debtor may become involved. No filing fees are required to file any of these pleadings. In addition, the Rules provide that the petition, a simple two-page "fill in the blank" form, need not be filed at the same time as the debtor's schedules and statement of financial affairs. Fed. R. Bankr.P. 1007(c) (if the

petition is accompanied by a list of the debtor's creditors and their addresses, the schedules and statements may be filed within fifteen days of filing the petition). It may be that Congress, while acknowledging that a BPP could properly be asked to take some of the debtor's pleadings to the Court for filing, simply preferred, in the exercise of its legislative prerogative, that BPPs not handle filing fees in any form, even if that created a practical problem in the filing of the original bankruptcy petition.

The logic of the cases like *Green* is also persuasive. As noted by the court:

> As explained by *Collier [on Bankruptcy]*, there were three reasons for the enactment of § 110(g)(1): (1) preventing the unauthorized filing of petitions; (2) preventing or curtailing the preparer's influence on a debtor's decision and timing on petition filing; and (3) preventing a preparer's misrepresentation, or misquoting of the filing fee. 2 *Collier on Bankruptcy,* § 110.06, pp. 110–09–11 (15th Edition 1996). In light of these concerns, § 110(g) prohibits a petition preparer from taking "control" of the filing fee and ultimately controlling the timing of the bankruptcy filing. The Court is inclined to agree with the UST. This issue goes far beyond the specifics of this particular case and finds its roots in the fundamental differences between lawyer and nonlawyer petition preparers. Since the enactment of § 110, much has been said about the statute's purposes. There are those among the nonlawyer petition preparer's ranks who insist that § 110 is a thinly-veiled attempt to protect the professional domain of lawyers and to exclude nonlawyers from making a living in the bankruptcy arena. While § 110 may, in fact, have the incidental effect of limiting the business of nonlawyer petition preparers,

this court views § 110 primarily as a consumer protection measure unrelated to the practice of law.

\* \* \* \* \* \*

When viewed from this perspective, the issue at hand is not whether [the BPP] received a "payment," defined in the most narrow sense. The issue is whether [the BPP] controlled the debtor's filing fee and ultimately controlled the timing of the bankruptcy filing. Given that [the BPP] took possession of the filing fee and controlled the ultimate filing of the petition, this court must conclude [the BPP] violated § 110(g). In so concluding, this court considers the *potential* for harm. If the procedure employed by [the BPP] was used by an unscrupulous and/or incompetent petition preparer, it could result in harm to debtors. Indeed, the timing of the filing can sometimes determine whether a debtor will lose his/her home or other property to foreclosure.

*Green,* 197 B.R. at 879–880. *See also In re Jones,* 227 B.R. 704, 705–706 (Bankr. S.D.Ind.1998); *In re Moffett,* 263 B.R. 805, 812 (Bankr.W.D.Ky.2001); *In re Burdick,* 191 B.R. 529, 535 (Bankr.N.D.N.Y.1996).

Congress could have justifiably concluded that the responsibility for filing the debtor's bankruptcy petition, with its attendant legal consequences, is a duty best entrusted only to trained, licensed, ethical professionals. Filing the petition is an act taken on behalf of another that will always have serious legal implications, and a potential for damage exists if it is not performed timely and correctly.[20] Prohibiting

a BPP from handling *any* filing fees, regardless of the form those fees may take, represents one possible congressional solution to ensuring that a BPP not perform this important duty.

As in *Green,* the question in this case is not whether Ms. Scott was guilty of any misconduct or negligence in filing Debtors' bankruptcy petition. Because § 110 is consumer protection legislation, the Court's concern must be whether in this and other cases the BPP should be placed in a position where she could harm a customer in connection with accepting the customer's filing fee check. While it is perhaps a close call, this Court prefers to interpret the Code in a manner that will address the potential legislative concerns that may have motivated Congress to act. Here, Congress expressed its concerns that a BPP's services were to be solely limited to typing, and that BPPs are not legally trained, nor subject to a regulated code of ethics. Preventing them handling a filing fee check may seem a severe, or even unnecessary, method of discouraging BPPs from assuming other duties. However, determining which method best suited its needs was a decision properly made by Congress which should not be second-guessed by not this Court.

The Court concludes that § 110(g)(1) prohibits a BPP from accepting a money order made payable to the Clerk of the Court in order to file the customer's bankruptcy petition. Ms. Scott violated that provision here.

### F. Sanctions

The Bankruptcy Code provides that this Court may impose sanctions and may issue

---

**20.** The court in *Green,* as an example of the harm that can result if a bankruptcy petition is not filed timely, notes that a debtor might lose his or her home to a foreclosure sale. *Green,* 197 B.R. at 880, n. 2. In such a situation, if the debtor had retained an attorney to handle the filing, "the debtor may have a claim for malpractice and could seek recovery either from the lawyer's insurance carrier or, in certain instances, from the state bar's client security fund. However, if [the party retained to handle the filing] was a nonlawyer petition preparer, it would be less likely that there would be a source of recovery." *Id.*

an injunction against a BPP in response to conduct found to violate § 110. The Court may also, in an appropriate case, certify the matter to the district court for a determination of damages. 11 U.S.C. § 110(i)(1) (providing that the Court shall award the debtor actual damages plus attorneys' fees and costs, and the greater of $2,000.00 or twice the amount paid the BPP, for engaging in any fraudulent, unfair or deceptive act). An injunction may issue if the Court finds that the BPP has engaged in "fraudulent, unfair, or deceptive conduct" in order to prevent the BPP from engaging in such conduct. 11 U.S.C. § 110(j)(2)(A)(i)(III), (j)(2)(A)(ii). The Court is also required to impose a fine in an amount not to exceed $500 if she violates §· 110(g)(1) by receiving a payment of filing fees from a debtor. 11 U.S.C. § 110(g)(2).

■■■■ This is the Court's first experience with Ms. Scott and her Franchisor. She seems interested in operating her business in a manner consistent with applicable law. Therefore, it is not the Court's intent to punish Ms. Scott for the violations described above, but instead to ensure the Bankruptcy Code provisions regulating BPP conduct are strictly observed. Therefore, in the exercise of its discretion, the Court will impose no punitive measures in this case, even though Ms. Scott has been found to have engaged in deceptive and unfair activities in her business.[21] In addition, while the Court must levy a fine against Ms. Scott for improperly accepting filing fees from Debtors, the Court sets the amount of that fine at $10 to reflect the fact that a good faith question

of first impression regarding construction of § 110(g)(1) was presented by this case.

However, the Court's willingness to withhold punitive sanctions in this case should not be misconstrued. Ms. Scott (and her Franchisor should know) that any further conduct in violation of § 110 could result in the imposition of appropriate and severe sanctions, and an injunction, if necessary.

## G. Reasonable Compensation

■■■■ 11 U.S.C. § 110(h)(2) directs the Court to "disallow and order the immediate turnover to the bankruptcy trustee of any [BPP] fee ... found to be in excess of the value of the services rendered for the documents prepared." The BPP, as the party seeking fees in this case, bears the burden of establishing she is entitled to them once a question regarding their reasonableness has been raised. *Bush,* 275 B.R. at 85–86; *see also In re Geraci,* 138 F.3d 314, 318 (7th Cir.1998). Consistent with the spirit of the statute, this Court held in *Bush,*

> A BPP can rightfully perform for debtors only the modest service of transcribing or typing bankruptcy forms that the debtors alone must prepare without assistance. The development of the law makes clear that other sorts of services are improper, and those services can *perforce* not be compensated. The charging of a fee which is in excess of the value of a BPP's properly limited services can, in and of itself, mislead debtors into believing that they are receiving (or are entitled to receive) ser-

21. Also, the Court is persuaded that it should not issue an injunction in this case since the OSC did not provide notice to Ms. Scott that the Court may be seeking an injunction pursuant to 11 U.S.C. § 110(j)(1). *See In re Graves,* 279 B.R. 266 (9th Cir. BAP 2002)

(voiding order entered by bankruptcy court on its own motion permanently enjoining BPP's conduct because the order to show cause did not mention a possible injunction, only fines).

vices in excess of what § 110 actually allows.

\* \* \* \* \* \*

The Court concludes that the proper reference point is what professional typists or word processors would charge. These are the kinds of services most comparable to what a BPP may legally do. *Bush,* 275 B.R. at 84–85. As a result of its analysis of several BPP cases, the Court has indicated that "a fee in the range of $50 to $60 would appear presumptively reasonable given the 'normal' consumer bankruptcy case." *Id.* at 86. However, after inquiry, the Court may determine a different fee is reasonable based upon the facts and circumstances of the case. *Id.* After consideration of the evidence and testimony submitted by the parties in this case, the Court finds and concludes that the $199.00 fee charged Debtors by Ms. Scott exceeded the reasonable value of the typing services she could properly provide in this case.

Even a cursory review of the petition, schedules, statement of financial affairs and other pleadings filed in this bankruptcy reveals it to be a simple, straightforward consumer Chapter 7 case. Debtors' schedules show they own no real property. Debtors include only nine entries in their schedules for personal property, including two small bank accounts, household goods, personal effects and clothing, and an older car, all with a total value of less than $5,000.00. Debtors list no secured creditors, two priority creditors, and less than twenty unsecured creditors. On their statement of financial affairs, of the twenty-five questions asked, Debtors had responses to only four. In other words,

many of the schedules prepared by Ms. Scott and the Franchisor required no specific information to be included, and merely that the boxes labeled "none" be checked. Few Chapter 7 cases will involve a simpler set of bankruptcy paperwork.

Next, as noted above, the necessary forms for filing a bankruptcy case are readily available to prospective *pro se* debtors free of charge. They are easily found on several government Internet sites, including this Court's own website, which provides forms customized for use in Idaho. Hard copies of the forms are available from the Clerk for $3.00. While the forms can also be purchased from commercial vendors, the Court wonders why anyone would spend the money to do so.

The Court's website also offers software enabling a debtor to actually fill out the forms, and to print off finished hard copies for filing. The Court has no personal experience with this system and expresses no opinion concerning the complexity of this task. By mentioning this fact, however, the Court acknowledges that if a prospective debtor were inclined to do so, a free mechanism for producing finished, printed pleadings exists.[22]

The above observations add necessary context to what follows. In other words, while a debtor may hire and pay a BPP to transcribe bankruptcy forms, free options to accomplish this task are readily available to the public.

Next, the Court respectfully rejects Ms. Scott's suggestion that her particular mode of service is "better" than that provided by other BPPs, and therefore, she provides added value to her customers justifying a higher fee. While Ms. Scott's work prod-

---

22. So there is no misunderstanding, while all involved in the process would likely prefer it, bankruptcy papers need not be typed or printed. In fact, a significant number of the *pro se* filings made in this District use hand-written pleadings. Provided such are legible, these papers are readily accepted and effective. *See* Fed. R. Bankr.P. 9004(a).

uct seems very professional, producing legible, accurately transcribed bankruptcy forms would seem to the Court to be a minimum standard for every BPP, and not a basis for enhancing the BPP's fee. Again, it must be remembered, that other than ensuring that the information provided by the customer is properly transcribed onto correct forms, the BPP plays no additional compensable role in the process of the customer's filing for bankruptcy.

In the discussion above, the Court has criticized as statutory violations Ms. Scott's practice of delivering the "Overview" to her customers. So, too, the Court has expressed its opinion that it is improper when Ms. Scott provides customers access to a lawyer, who does not represent either Ms. Scott or those customers, and who will not respond to anything other than "general" bankruptcy law questions not involving the customers' particular circumstances or interests. The Court has also reviewed Ms. Scott's "Workbook" and found it, with some unfortunate exceptions, to be a recapitulation of the official forms. A BPP may not be compensated for services found inappropriate under the Bankruptcy Code. That said (again), Ms. Scott is not entitled to an enhanced fee for providing these "services."

In an affidavit filed with the Court, Ms. Scott outlined the services she personally provided to the Debtors. Declaration of Judith M. Scott in Response to Order to Petition Preparer to Show Cause, Ex. A, Docket No. 7. Her itemization of time shows she spent almost four hours working on Debtors' project, and of course, lists no time for any actual typing or word

processing, all of which was performed by Franchisor's staff in California. Other than a brief time spent with Debtors to receive her assignment, to provide Debtors with the forms to complete, to receive the completed forms, and to deliver those completed forms to Debtors, all Ms. Scott's time is outside that allowed under § 110 and, in the Court's opinion, noncompensable. For example, Ms. Scott, as a typist, is not eligible for compensation for time spent meeting with the Debtors to have them "review and sign [the] bankruptcy petition." Moreover, some of the entries in her affidavit are simply not credible. The Court respectfully rejects the notion it took Ms. Scott nearly an hour to photocopy and collate the simple set of papers she produced in this case.

Given the problems inherent in Ms. Scott's itemization of time, the Court must instead look to the other evidence presented concerning the reasonable value of her services. At the hearing, Ms. Scott offered the Court the testimony and a written declaration of Chelsie Thompson, an experienced typist employed at a local business support service. She testified she was hired by Ms. Scott to type, from the handwritten information prepared by Ms. Scott, a finished copy of Doser's bankruptcy papers, using the official forms, numbering 39 pages in length.[23] The witness testified this assignment required five hours to complete, and that she charged Ms. Scott $30.00 per hour to perform the service for a total of $150.00.

Even if Ms. Thompson's testimony is regarded by the Court as establishing the reasonable value of Ms. Scott's services, it

---

23. The Court was not provided with Ms. Thompson's actual finished product. The Court's file shows that the bankruptcy petition, cover sheet, schedules, statement of affairs, and the three-page mailing matrix, amount to only 35 pages. Not counted, of course, was Ms. Scott disclosure form, the cost of preparation of which the Court suggests should not be charged to the Debtors. The Court can not explain the remaining difference in page numbers.

also proves Ms. Scott's fees in this and other cases ($199.00) is excessive. However, the Court is cautious in accepting this proof as a reliable for several reasons. Ms. Thompson testified she used a typewriter, and not a standard computer running modern word processing software, to complete this project. She also freely admitted she personally had no experience typing bankruptcy forms, and that her company does not regularly serve customers wanting papers prepared for filing in bankruptcy court. This experience with bankruptcy forms, was for Ms. Thompson, her first.

■ The Court recently visited the issue of what constitutes a reasonable fee for BPP services in *Bush*, a case involving another Boise BPP. *Bush*, 275 B.R. at 84–85. There, the Court determined that $54.00 and $66.25 was the reasonable value of the services provided by the BPP to the two debtors based upon the evidence submitted concerning the market rate for typing services. The Court also noted that "[t]he reasonableness of a given BPP charge is a factual matter which can only be determined on a case-by-case basis." *Id.* at 85 While each case stands on its own merits, the $199.00 for document preparation charged by Ms. Scott here is a long

throw from that allowed by the Court in *Bush* or otherwise.[24] Just as the Court is constrained to apply rational standards in judging professional compensation awards under the Bankruptcy Code, *see* 11 U.S.C. §§ 329(b), 330(a), the Court should ensure that consistent and fair rates of compensation are applied to the BPPs plying their trade in this District, with appropriate consideration to the complexities and idiosyncrasies of each case.

Ms. Scott argues that We the People fees in the amount collected here have been approved by at least two other bankruptcy courts. She provided the Court no reported decisions to support her argument, but did submit anecdotal evidence that, apparently, shows the bankruptcy courts in Santa Barbara, California and Denver, Colorado have not reduced We the People fees after reviewing them. This Court does not presume to criticize the decisions of other bankruptcy courts when faced with this issue. However, the information supplied by Ms. Scott about those decisions is of little value and less than persuasive. The "reasonableness" of a BPP fee is a function of the complexity of each individual case and the conditions existing in the local market. That $199.00 was deemed a reasonable fee in the metro-

24. Again, while each case is potentially unique, other recent decisions regarding BPP fees, the amounts approved were similarly less than requested here. *See Hastings v. United States Trustee (In re Agyekum)*, 225 B.R. 695, 700 (9th Cir. BAP 1998) (lower court correctly limited fee to $125.00 according to the Northern District of California's Bankruptcy Petition Preparer Guidelines); *In re Landry*, 250 B.R. 441, 446 (Bankr.M.D.Fla. 2000) (reasonable fee for routine Chapter 7 bankruptcy petition and schedule preparation was $50.00); *In re Cordero*, 185 B.R. 882, 884 (Bankr.M.D.Fla.1995) (allowing $50.00 for services provided by a bankruptcy petition preparer); *In re Moffett*, 263 B.R. 805, 816 (Bankr.W.D.Ky.2001) (an hourly fee of $20.00 with a maximum fee not to exceed $100.00

adopted for all bankruptcy petition preparers); *In re Mullikin*, 231 B.R. 750, 753 (Bankr.W.D.Mo.1999) (absent special circumstances, BPPs may not charge in excess of $150.00 for their services, including expenses such as messenger services, postage, telephone, etc.); *In re Moran*, 256 B.R. 842, 851 (Bankr.D.N.H.2000) (court held that BPPs could perform services for $150 or less); *In re Burdick*, 191 B.R. 529, 538 (Bankr.N.D.N.Y. 1996) (allowing $50.00 for services provided by a BPP); *In re Wagner*, 241 B.R. 112, 122 (Bankr.E.D.Pa.1999) (the fair value of a BPP's services cannot exceed $50.00); *In re Guttierez*, 248 B.R. 287, 299 (Bankr.W.D.Tex.2000) (a reasonable fee for typing services cannot exceed $50.00).

# 317

politan markets in Southern California or Denver, if indeed that is what the other courts determined, is not dispositive in this District, or even in the Boise area.[25]

Moreover, while not cited to the Court by Ms. Scott, it appears various We the People operations have been criticized, and even sanctioned, for engaging in inappropriate practices and for charging excessive fees by the bankruptcy courts in the only reported cases that the Court could locate through its own research. *See In Re Boettcher*, 262 B.R. 94 (Bankr.N.D.Cal. 2001) (fining We the People franchisee $2,000.00 for engaging in unauthorized practice of law.);[26] *In re Evans*, 153 B.R. 960 (Bankr.E.D.Pa.1993) (holding that fee charged by a We the People, Tampa, franchisee operating in Pennsylvania was excessive, and reducing it to $100.00 under 11 U.S.C. § 329). Surely, Ms. Scott would not want this Court to determine that her fees are *per se* excessive because another bankruptcy court had come to that conclusion about a different franchisee operating in a different locale. So, too, this Court's conclusions regarding the reasonableness of Ms. Scott fees must rest on the facts of this case alone.

Turning now to those facts, and as explained above, this bankruptcy case required the preparation of an extremely simple set of bankruptcy schedules. Whatever the range of reasonable fees, this case justifies a fee at the lowest end of that range.

In determining a reasonable level of compensation for a BPP in typing these forms, the Court should not be asked to ignore the widespread availability and use of inexpensive, commercially-sold word processing software designed for use in preparing bankruptcy filings. It looking at the thousands of cases filed annually in this District, it appears that the vast majority of law offices utilize such a tool in producing bankruptcy forms. In addition, Ms. Scott admits We the People employs such software in its California operation. As a result, showing the Court what it may cost to hire an someone to type bankruptcy forms on a standard typewriter does not reflect the real world.

The Court should also be able to presume that in determining comparable worth, the relevant "typist" has some familiarity with the substance of the paperwork he or she is asked to prepare. The Bankruptcy Code directs the Court to determine whether Ms. Scott's fees as a BPP, and not as a typist, are excessive, and that presumes her fees should be compared to other BPPs who are familiar with the format and substance of bankruptcy papers. Again, this assumption reflects the reality that, as testified by Ms. Scott, We the People's word processors in California are in fact very experienced with preparation of bankruptcy pleadings. The Court speculates that even Ms. Thompson, who concedes she has no background with bankruptcy papers, could do the same job faster a second time, and even more efficiently thereafter if given the modern tools

25. Although the Central District of California, in which Santa Barbara lies, has no present guidelines for BPP fees, the Bankruptcy Court for the Northern District of California, serving the metropolitan areas of San Francisco and San Jose, has issued guidelines capping the maximum allowable charges for a BPP's services at $125, which includes any and all expenses such as photocopying, messenger or courier charges, postage, and telephone charges. This fee does not include the filing fee. Bankruptcy Petition Preparer Guidelines, N.D. Cal., issued pursuant to B.L.R. 9029-1.

26. While not cited to the Court, Ms. Scott's attorney here, Mr. Lubetzky, appears from the report of this decision to have been counsel for the Franchisor. 262 B.R. at 95.

to do so. If Ms. Thompson was experienced in navigating the official forms for a bankruptcy case, and was allowed to replicate the Doser project using a computer running standard bankruptcy-form software, the Court is confident the time required to complete this project would decrease markedly.

While based upon the Court's experience it would seem to represent the high end of the market range, the Court will accept $30.00 per hour as a fair representation of the cost of commercial typing services.[27] Use of this hourly rate sufficiently compensates Ms. Scott for all her overhead and expenses, and reflects a profit margin. However, based upon all the facts and circumstances, the Court concludes that 2.5 hours is a sufficient time to produce Debtors' simple bankruptcy schedules under comparable, realistic conditions.

The Court will also allocate an additional half hour of time in this case to the performance of miscellaneous proper services by the BPP. This would include time required to give the forms to Debtors to complete, to review the information submitted by Debtors for typing for legibility, to photocopy and collate the final documents when completed, and to mail Debtors their copies after the documents were prepared. No compensation can be allowed to Ms. Scott for presiding over a "signing session," nor for taking the papers to the courthouse for filing. These services presume Ms. Scott has special skills to offer her customers beyond preparation of the documents, and as discussed above, such services are not contemplated by or compensable under § 110. If Ms. Scott desires to offer her customers such services, as a matter of business judgment she of course may do so. However, the Bankruptcy Code allows her compensation only for her typing services.

Accordingly, the Court will allow Ms. Scott a total of $90.00 (3 hours at $30.00 per hour) for her document preparation services. No additional compensation is justified nor available under § 110.

 Ms. Scott charged Debtors $15.00 for their copies of the bankruptcy papers. The statute provides that as a BPP, Ms. Scott has the duty to give her customers one copy of the original bankruptcy papers as part of her services. 11 U.S.C. § 110(d)(1). In light of this statutory duty, the cost of producing this copy, like the cost of paper, rent and utilities, must be subsumed in Ms. Scott's operating overhead expenses, and should not be separately billed to the client. However, Ms. Scott is entitled to reimbursement in a reasonable amount for providing Debtors additional copies of their paperwork. At the time of filing a Chapter 7 petition, a debtor must submit two additional copies of the papers to the Clerk. L.B.R. 1002.1(a). As noted above, there are 35 pages included in Debtors' original filings. The Court concludes $.10 per page represents reasonable reimbursement for photocopy costs. Therefore, Ms. Scott is entitled to $7.00 for copy costs, not the $15.00 she collected. While no specific amount was established in the record, the Court will also allow Ms. Scott $3.00 for her

---

27. In the *Bush* case, the parties submitted a variety of evidence to the Court concerning the appropriate market hourly rate to use in valuing the typing services provided by a Boise BBP. The rates ranged between $12.00 and $25.00 per hour. 275 B.R. at 85 and nn. 30, 31. Since here the Court heard only from Ms. Thompson, the Court will not unilaterally adjust the rate she sponsored in favor of some lower amount. However, the appropriate and reasonable rate is to be considered in each individual case, and the Court reserves discretion to adopt a different rate based upon the evidence submitted in those other cases.

estimated postage costs for mailing the confirmation of filing to Debtors.

In summary, the Court concludes Ms. Scott charged and collected a fee in excess of the value of her proper services rendered in this case. 11 U.S.C. § 110(h)(2). The evidence shows she was entitled to fees and costs totaling $100.00. She collected $214.00 from Debtors. Therefore, Ms. Scott must refund $114.00 to the trustee in this case. If she fails to comply with the order to turn over these funds to the trustee within thirty days, the Court will consider the imposition of additional fines as provided by 11 U.S.C. § 110(g)(4).

## V. Conclusion

For the reasons set forth above, the Court concludes Ms. Scott has violated the provisions of § 110 of the Bankruptcy Code. She has engaged, in several respects, in activities as a BPP which exceed her proper role as a document preparer, and which amount to unfair and deceptive conduct as to Debtors and her other customers. While she will not be sanctioned for her conduct on this occasion, she is admonished by the Court to refrain from further violations of the Code under penalty of possible future sanctions if she fails to do so.

Ms. Scott shall be fined the sum of $10.00, payable to the trustee, for her violation of § 110(g)(1).

Ms. Scott also received an excessive fee in this case for the services she could properly provide Debtors in violation of § 110(h)(2). A reasonable fee was $100.00 plus the actual cost of postage. She collected $214.00 and must refund $114.00 to the trustee in this case.